Alling *v.* Alling.

EMMA H. ALLING

*v.*

FLORENCE W. ALLING.

1. A court of chancery has no jurisdiction to compel a parent to support an infant child.

2. The question of the extent of a parent's duty to support his or her infant child can arise in this court only where the parent asks for an allowance for that purpose out of the child's fortune.

3. In determining this question the court will take into consideration all the circumstances, including as well the parent's ability as the child's fortune.

4. There is no difference between the parents as to their duty to maintain their offspring. The mother is under the same obligation as the father in that behalf. During coverture, with its incidents, at the common law, her duty was suspended, but during her widowhood, and especially under the modern statutes giving her dominion of her own property, she is under the same obligation as the father.

5. This court is bound to set up the statute of limitations in favor of an infant defendant, against its will even, as against a demand in favor of a mother, unless the case discloses some circumstance which renders such plea inequitable.

Alling *v.* Alling.

6. When an allowance for past support of an infant is asked for on behalf of a parent or guardian, the court will make such an allowance only as it would have made if it had been asked for in advance, and will not be influenced by any subsequent fortuitous increase of the infant's fortune.

7. In fixing such allowance the court will not do more than indemnify the parent or guardian for actual disbursements. It will not allow anything in the nature of profits.

Heard on bill, answer and oral proofs.

*Mr. William Brinkerhoff,* for the complainant.

*Mr. James P. Northrop,* for the defendant.

PITNEY, V. C.

This is an undefended suit brought by a mother against her only child and daughter, an infant about nineteen years old. The mother is, and had been, a widow since 1876. The daughter was born in 1874. The claim is for compensation for support, maintenance and education furnished by complainant from the death of the husband and father until date, and for an order for an allowance for future support, during minority, out of the fortune of the infant.

The daughter has recently come into a small fortune from two sources, namely, a part from her father's estate, which is in her mother's hands as his administratrix, and a part from an uncle, which is in the hands of a Mr. Clump, as her guardian. The fund coming from her father was vested in him, before his death, under the will of his father (grandfather of defendant), but was subject to a life estate in the widow of the testator, who died in December, 1889. Under that will the executor has paid to the complainant, as administratrix of her husband, about $5,000, and she will receive a further sum of about $6,500, making, in all, about $11,500. Of this sum the complainant is entitled, as one of the next of kin of her husband, to one-third, leaving less than $8,000 for her daughter, the defendant. The other fund, coming from the uncle, amounts to about $6,850, and was vested in the defendant by the probate of the will of

the uncle in April, 1890. That sum, however, included interest for two years, so that the net amount was about $6,000. It follows that the pecuniary position of the defendant has been as follows: At the death of her father intestate in 1876, when she was a helpless babe, she became entitled to a share in her grandfather's estate, which amounted to a little less than $8,000, but it was subject to a life estate in her grandmother. She derived no present income from it until 1890, and in that year she became entitled, under the will of her uncle, to a share in his estate, amounting to about $6,000, making a total estate of about $14,000.

At the death of the husband, the widow and her infant child were substantially without means, and the mother was obliged to work to earn a living for both. This she did. By her industry, energy and general ability she was able to support herself and child in comfort, and to educate her daughter in a manner becoming to her station. She accomplished this without outside pecuniary aid, or at all running in debt, at least up to the date of the grandmother's death. Her demand against the daughter for her support, education and maintenance amounts to over $12,000, or four-fifths of the child's fortune. And yet the daughter, an intelligent young lady, frankly declared on the stand that she wished her mother to be paid in full.

It is hardly necessary to say that this court cannot act upon such consent, but must defend the daughter even against her own mother's claim, examine the demand, and see if it is lawful and proper to be countenanced and enforced by this court.

And, *first*, assuming the demand to be legal, just and equitable in all its parts, and in all respects such as this court would sanction, the question arises, shall this court waive, on the part of the infant, the benefit of the statute of limitations for so much of the demand as arose more than six years before bill filed?

It must be observed that it was quite competent for the complainant to apply to this court years ago for the very same relief that she now asks for. She knew of her daughter's vested interest in her father's share in his father's estate, and the amount of it could have been approximately ascertained by this

court; and it was competent for this court to have inquired into
the propriety of breaking into the principal of this fortune for
the child's present support and to have directed how far, if at
all, it should be anticipated.    The complainant did not see fit to
do this, but was content to earn a support for her child without
taking any steps whatever to protect herself for the expense of
it.    In fact, it is probable she had no thought at that time
of ever being reimbursed.    Her right before the death of the
grandmother and uncle was quite as clear as it is now.    If she
can sue and recover now it is because she might have sued
and recovered years ago; and it is well settled that this court
will make no order for allowance for past maintenance which it
would not have made if called upon to do so in advance.    The
complainant did not, prior to the grant to her of administration
of her husband's estate, occupy the position of a trustee, guar-
dian or the like, who has made payments and advances out
of a fund in his hands belonging to the infant, and is now
seeking allowance for such payments, as was done in the case of
*McKnight* v. *Walsh, 8 C. E. Gr. 136;* also, in effect, in *Pyatt* v.
*Pyatt, 1 Dick. Ch. Rep. 285.*    The circumstance that since the
great bulk of this demand arose, the complainant, by obtaining
letters of administration upon the estate of her husband, has
become possessed of a portion of the child's fortune, does not
alter her position or strengthen it in the least.    There is no con-
nection between the services rendered before administration for
the child and the duty, if there be any such, on the part of the
child to reimburse the parent, on the one hand, and the fact,
on the other hand, that she happens to have been appointed
the administratrix of the child's father.    Such appointment is,
for present purposes, purely fortuitous.    She stands, therefore,
before the court precisely as would a person who sues on a
*quantum meruit* for necessaries supplied to an infant.    And as to
so much of her demand as arose before the date—April, 1890—
of letters of administration and the receipt by her of her hus-
band's share of his father's estate, she is, in substance, asking to
be permitted by this court to set off a previous independent

---

Alling *v.* Alling.

---

demand which she had against her daughter against her daughter's share in that estate.

The statute of limitations is binding on this court as well as on the courts of law, and whenever a pecuniary demand will be barred at law it will be barred here, unless there is some circumstance in the case which renders it inequitable for the party entitled to its benefit to set it up. We have seen that this is a simple pecuniary demand, founded on a *quantum meruit,* and I am unable to find in the case any circumstance which renders it inequitable for this defendant to set up the bar of the statute against her mother. She is clearly entitled to the benefit of the plea, and it is the duty of this court, as her guardian, to plead it for her. When she attains twenty-one years of age she can do what she pleases with her money, but this court cannot permit her, while a ward, to give it away, even to her own mother.

I feel constrained to disallow so much of complainant's demand as arose six years before bill filed.

*Second.* As to so much of the claim as arose within six years before bill filed, namely, since February 11th, 1887. At that date the defendant was about thirteen years old, and, so far as appears, in a normal condition of health. She could, possibly, if pressed, have earned a scanty living for herself, and thus the mother might have been relieved from the statutory duty to support her in order to prevent her from becoming a public charge. *Rev. p. 843 § 30.* But the physical ability of the child to earn its bare food and clothing is not the test or gauge in this court of a parent's duty to support and educate it.

The question of the extent of the duty of a parent to support and maintain an infant child can be raised in this court only when the child has a fortune of its own. This court has no jurisdiction to compel a parent to support an infant child. *In re Ryder, 11 Paige 185 ; Hodgens* v. *Hodgens, 4 Cl. & F. 323.* But when the infant child has an estate of its own and the question arises, directly or indirectly, how much, if anything, the parent shall be allowed out of such estate for the infant's support, the court will consider and determine the parent's duty

toward the child and his or her ability to perform that duty.
Such is the present case.

Upon general principles, I am unable to perceive any differ-
ence between the parents as to their duty of support of their
child.    Each is equally responsible for the existence of the child,
and each by natural instinct feels the duty, as well as the desire,
to protect and nourish their common offspring.

The master of the rolls, in *Fawkner* v. *Watts, 1 Atk. 406*
*(1741)* (at *p. 408*), says: "I shall not dispute but every father
and mother, by the law of nature, is under an obligation *to*
*maintain* their own children, but yet this may be varied by cir-
cumstances, for suppose the father or mother should be in a low
or mean condition in the world, the court will order, especially
in the case of a mother, that the child should be maintained out
of a provision left to it by a collateral relation."

In *Swinnock* v. *Crisp, Freem. Ch. 78 (1681)*, also in *S. C.,*
*Anonymous, 2 Vent. 353*, the plaintiff sued a stepfather to recover
a legacy which had been left to him by his own father, and
which should have been paid to the plaintiff by his mother, who
was the executrix of the will.    The defendant and second hus-
band set up as a defence that he had maintained and educated
the child for several years and given him a good education,
which cost him more than the interest on the fund ; and that he
had bound the child as an apprentice and paid £70 for appren-
tice fee ; but the court would not allow anything out of the prin-
cipal toward such maintenance, but only the interest, by reason
that the defendant had married the mother, *who was bound to*
*maintain her own children*, and as to the £70 which was paid
out to apprentice the child, that was allowed out of the principal.

*Billingsley* v. *Critchet, 1 Bro. Ch. C. 268 (1782)*, was a suit
by the children of Billingsley against his widow, married to
Critchet.    By the will the widow had also a provision, and she
had a further estate from her own family.    The question was
whether the mother was obliged to support these children, or
it was to be done by an allowance out of the interest of the
stocks given to them by their father.    Counsel expressly ad-
mitted that the mother was under natural obligation to maintain

7

her offspring. Lord Commissioner Ashurst said: "*If the mother still continued unmarried, I should have some doubt;* but, since her marriage, she is entitled to an allowance, otherwise it would be compelling the second husband to keep the children, who is under no natural obligation so to do." And Lord Commissioner Hotham concurred on the ground that the second husband was entitled to have his wife's fortune uncharged.

In *Hughes* v. *Hughes, 1 Bro. Ch. C. 387* (cited by Chancellor Kent, *2 Com. 190,* for a contrary doctrine), Lord Thurlow recognized no distinction between the father and mother with regard to their respective duty to support their offspring, and the inquiry there directed was as to the ability of both parents.

The subject was also considered by Chancellor Livingston in *Wilkes* v. *Rogers, 6 Johns. 573.* That was a dispute between a mother, who had married a second husband, and the children of the first husband, as to the expense of their support during their infancy and their mother's widowhood. The first husband, Wilkes, who died intestate, had left a large estate, both real and personal, and the widow, as his administratrix, had managed it with great ability and supported the children, and after her second marriage a bill was filed by the children for an accounting, as in *Pyatt* v. *Pyatt, 1 Dick. Ch. Rep. 285.* Chancellor Livingston reviews all the authorities and holds that the mother's liability, when a widow, to support her infant children is the same as that of the father. The decree made by the chancellor was varied on appeal, but his doctrine was not seriously disturbed. Judge Yates (at *p. 586*), says: "I cannot, however, assent to the distinction, in so full an extent as the counsel on the part of the appellants have attempted to establish it, that the obligation of maintenance and education of children is, at all times, only applicable to the father. On the contrary, if the mother possesses an ample fortune, in her own right, the natural situation in which she is placed, according to my view of the subject, renders it equally obligatory on her to provide for her offspring," citing the authorities.

In *Dedham* v. *Natick, 16 Mass. 135,* it was held that the mother, after the death of the father, remains the head of the

family, and has a like control of the minor children as he had when living.  She, if of sufficient ability, is bound to support them, and they cannot by law be separated from her.

The equality of natural obligation resting upon both parents to support their children is illustrated and vindicated by the case of *Finch* v. *Finch, 22 Conn. 411.*  This was an action by a divorced wife against her former husband to recover for the expense of maintaining their common children after the decree of divorce, by the terms of which the custody of the children was given to the wife.  The cause was elaborately argued.  At *p. 415* the court says:  "The case discloses nothing from which we can infer or presume that the mother is not of equal pecuniary ability with the father to maintain their common offspring, nor whether the father has adequate ability to do it.  There is a law of our universal humanity as extensive as our race, which impels parents, whether fathers or mothers, to protect and support their helpless children.  It is a duty common to both, and the consequent obligation is common.  Blackstone very properly says that 'the duty of parents to provide for the maintenance of their children is a principle of *natural law.*  By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved.  And thus the children will have a perfect right of receiving maintenance from *their parents.*'  This duty and this obligation have been variously modified by the positive laws of civilized countries, but fully recognized by all.  Connected with this obligation of maintenance there is a parental privilege.  The parent is entitled to the custody and care of the child which he sustains and to such service as it can render, and he has a right to exercise his own discretion in determining the fitness and necessity of the allowances to be made and of the support to be furnished to his children, for which he is to be made chargeable."  And again (at *p. 416*):  "The *legal* liability of the parent necessarily depends upon his or her ability to furnish the maintenance.  So long as the parents are both living and continue in a state of coverture or marriage, the civil or legal liability of the mother

to furnish pecuniary aid or maintenance to her children is suspended or postponed because, as is said by Kent in his *Commentaries, vol. 2, p. 192,* 'When the wife, by her marriage, parts with her ability to maintain her children she ceases to be liable. By her marriage and while it continues she has most effectually parted with her ability and has transferred it, in many instances, to her husband. Her civil existence, even, for many purposes and for this especially, is merged in that of her husband. Her personal property has become his and the use of all her real estate with it, so, as between themselves as well as others, it is equitable and just that the whole burden of maintaining their children should be thrown upon him. *But even in such a case, a court of chancery, if the wife had a competent separate estate and the husband or father had none, might decree a maintenance by the mother.*' We know of no regulation in England or in this country, except the inability occasioned by coverture or the want of pecuniary means, by which the equal natural obligation of the mother to maintain her minor children, who are too helpless to maintain themselves, is excused. By the civil law, this common duty of the parents was enforced."

Here is pointed out the foundation of the real and only difference in the liability of the father and mother. In the first place, the mother is, by nature, weaker and less able to provide for her child; and in the second place, the common-law disability of coverture, which vested her husband with all her personal property and the income of her realty, left her without pecuniary ability. Out of this condition has arisen the notion and rule of law, so far as it is a rule, that the father is liable and the mother is not, to support their infant children.

This rule is further illustrated by the case of *Hodgens* v. *Hodgens, 4 Cl. & F. 323,* an appeal from the Irish chancery, which was somewhat like *Finch* v. *Finch, supra,* in that it was a contest between father and mother as to which should support their infant children. In neither case, however, was involved the question of taking a portion of the infants' fortune for their own support. In the Irish case the parents were not divorced, but were living in a state of separation, caused by the wife's

cohabitation with a paramour, and the wife had a large estate settled, in effect, upon her by an order of the court made with her husband's consent when in contempt of the court for having married her while the ward of the court, and such estate was still under the control of the court.  Years afterward she eloped with a paramour, and the husband applied to the court to vary its previous order so as to allow him a yearly sum for the support of the children of the marriage.  The master of the rolls in Ireland made him an allowance accordingly.  *1 Lloyd & G. t. P. 148.*  This order was discharged by Lord-Chancellor Sugden (*Lloyd & G. t. S. 299*), but was restored on a rehearing by Lord-Chancellor Plunkett (*1 Lloyd & G. t. P. 137*), and finally discharged by the house of lords.  The powerful reason which influenced Sir Edward Sugden and the house of lords was the conduct of the husband in first marrying the ward of the court in the manner stated in the report, and again, after separating from her and promising the court not to live with her, abducting her and taking her out of the jurisdiction.  The judges declared that they never would permit a man who had been guilty of contempt of court, in the manner stated, to derive the least pecuniary benefit from the fortune of his wife.  Both Sir Edward Sugden and the lords, on appeal, declared that the court of chancery had no power to compel a mother to support her children in their father's lifetime.  Lord Cottenham said: "As between the mother and the children, I know of no authority for saying that the court has jurisdiction to take from the mother that which the court has given to the mother as against the right of the husband, for the purpose of creating a benefit for the children.  *  *  *  I do not feel that a court of equity has a right, under the circumstances of the case, to interpose on behalf of the children against the decree which their mother had obtained by means of the exercise of the jurisdiction of the court against the marital rights of her husband."  And Lord Wynford said "that by no existing law in this country can a woman be compelled to maintain her children, her husband being alive."  All the judges expressly recognized the moral duty of the wife to

support her children, but said that it could not be the foundation for a decree.

Chancellor Kent (*2 Com. 191*) says : "The father is bound to support his minor children, if he be of ability,   *   *   *   but this obligation, in such a case, does not extend to the mother, and the rule, as to the father, has become relaxed." Here it is plain that he is dealing with the liability of the mother while the father is alive, for further on, as above quoted (at *p. 192*), he says : "When the wife, by her marriage, parts with her ability to maintain her children, she ceases to be liable.   *   *   *   If, however, the wife has separate property, the court of chancery would undoubtedly, in a proper case, make an order charging that property with the necessary support of her children and parents."

I have already shown that the court has no such power, and I quote this last passage to throw light on the previous one, which has often been cited as authority for what I deem an erroneous position, viz., that a widow with a fortune is under no obligation to support her infant children. I think the last clause, though erroneous, as written, contains the germ of the true rule, namely, that where a widow asks for an allowance out of her infant child's fortune for its support, the court will take into consideration her own ability to furnish such support. Moreover, the authorities cited by Chancellor Kent seem to me not to support his text, unless construed to apply only to mothers with living husbands. They are *Hughes* v. *Hughes, supra; Pulsford* v. *Hunter, 3 Bro. Ch. C. 416; Haley* v. *Bannister, 4 Madd. 275; Whipple* v. *Dow, 2 Mass. 415; Dawes* v. *Howard, 4 Mass. 97.*

It is difficult to ascertain from the report what was actually decided in *Pulsford* v. *Hunter*, but it certainly does not support Chancellor Kent's text unless construed as above.

In *Haley* v. *Bannister*, a grandfather, by his will, made provision for his grandchildren, the children of a daughter who had a husband still living. The husband was poor, but the wife had a handsome separate estate. An allowance was given to the husband out of the children's fortune, on the ground that the

Alling *v.* Alling.

mother, during the life of her husband, was not under a legal obligation to maintain the children.

*Whipple* v. *Dow* was an action by a widow against her daughter and her husband, after she attained her majority, for her support and maintenance while she was an infant.  The facts were that the father died leaving a dwelling-house which descended to the defendant and her two sisters, subject to plaintiff's dower, which was never claimed by or assigned to her.  Plaintiff continued to keep the house after the death of her husband and supplied it with necessaries for herself and daughters during their minority.  The latter worked abroad and received the proceeds of their labor to their own use, there being an understanding and agreement between the mother and daughters, made while they were infants, that the mother should occupy the house without rent and that the daughters should board and lodge with her without paying anything therefor.  During all this time the defendant was under age and worked at a factory, receiving the whole of her earnings to her own use, being boarded by her mother, but furnishing her own clothing.  Of her earnings she had saved $100, which her husband received from her at their marriage.  After the marriage the husband repudiated the contract made by his infant wife with her mother, and sued the mother and compelled her to account for and pay the proportion of the rent of the house which belonged to his wife, after which the mother brought this action to recover for the board of her daughter.  Upon this evidence the judge charged the jury that the obligation of the parent to support the child depended on the ability of the parent so to do, and that the earnings of the child while so supported belonged to the parent, and further charged that the plaintiff might recover ; and this ruling was affirmed by the court *in banc.*

In *Dawes* v. *Howard* the question was between father and children, and Chief-Justice Parsons said: "When minor children have property of their own the father is, notwithstanding, bound to support them if of ability."

In *Ex parte Lord Petre, 7 Ves. 403,* before Lord Eldon, the case arose on a petition presented by Lord Petre, an infant

eight years old, and his two sisters, still younger, which prayed for proper allowance to his mother, a widow, out of his income, for his support. By the settlement in tail of his landed estate, his mother was entitled to a jointure of £1,500 a year, and the income was subject to portions of £10,000 each for his sisters and maintenance not exceeding £400 a year during the minority. Besides, the mother received by the will of the late Lord Petre, £2,000 a year and a house rent free. The master, by his report, advised an allowance of £1,600 a year out of Lord Petre's income to Lady Petre for the maintenance and education of Lord Petre for the time past since the death of his father and the time to come, and £400 a year for each of his daughters. When this unopposed petition and report came before Lord Eldon, he, of his own motion, directed a reference back to the master to review his report, regard being had to the circumstances of the daughters *and their mother.* The master, by his further report, repeated his former opinion, observing that Lady Petre's annual income did not exceed £2,000 a year. The Lord-Chancellor stopped Mr. Romilly in support of the report, saying that he should " confirm the report, though not very willingly, and would not lend a willing ear to any application to increase this allowance." It thus appears that Lord Eldon deliberately inquired into the pecuniary ability of the widowed mother before fixing the allowance to her out of the estate of her infant son for his support.

Neither this case nor any of the others above cited were cited before Lord Langdale in *Douglas* v. *Andrews, 12 Beav. 310, 19 L. J. Ch. (N. S.) 69,* when he said, without consideration, that there was no authority for an inquiry into the ability of the mother in such case.

The question here under consideration is not affected by the rules governing courts in determining the question of advancement or no advancement under the statute of distribution, or of advancement or loan between parent and child. In such case they proceed upon the notion that a father is under a sort of moral obligation, which a court of equity recognizes, to provide— that is, make a provision—for his children, by which is meant

something over and above mere education and maintenance. *Thornt. Gifts & Adv.* § *564 et seq.*, and cases cited. It seems to be settled in England that a mother is not under any obligation to make such a provision for her child.

I have felt constrained to make this rather tiresome examination of the authorities by what was said, not by what was decided, in the case of *Pyatt* v. *Pyatt, 1 Dick. Ch. Rep. 285.* There a widow was left with a family of four infant children, and with no means except what was left by her husband, who died intestate. His estate consisted of a farm and a small personal estate, which netted in her hands as administratrix $2,614.68, and in which her own share was $871.56, and that of each of her four children $435.78. The mother expended all these moneys, and more which she borrowed from her father, in the support of herself and children as a family on the farm left by the father. One of her daughters, who had enjoyed the benefits of this home as well during her minority as for years afterwards, cited her mother to account for the moneys so received by her, and it was held that the mother was entitled to allowance for the support of the child. In the course of his opinion, the learned judge, who spoke for the court of errors and appeals, uses this language: " The actual use of the very moneys in her hands as guardian, to purchase the necessaries of life for the children, shows unmistakably that she was not intending to support them at her own expense. *Indeed, she seems not to have had any other resources for their maintenance.* As a general rule, a widow is not bound to support her minor children out of her own property, if they have means of their own (*2 Kent Com. 190*), and she is entitled to a complete indemnity out of their estate for the money expended by her on their maintenance within proper limits. *Bruin* v. *Knott, 1 Phil. 571; Matter of Bostwick, 4 Johns. Ch. 104.* It necessarily follows that, when she has cast upon her, as their guardian, the duty of maintaining them and has actually used their money for that purpose, she must be considered to have meant to charge their estate with their support, and all reasonable expenditures therefor should be allowed to her."

In the case cited from *4 Johns. Ch.*, the mother, Mrs. Bost-
wick, who had become, in the eye of the law, a widow by a
judicial separation from her husband, was entitled, under her
father's will, to the interest during her lifetime upon the sum of
$3,883, which at her death went to her six children, all infants
requiring support and maintenance. In addition to this annuity
she had a legacy of $250, and the leasehold on a small house,
valued at $250. This constituted her fortune. And this pit-
tance, with the interest on the fund, she had expended in sup-
porting her children, and had, besides, run in debt for that
purpose to the extent of $682.82. In this situation she filed
her petition, asking that she might be repaid only the sum of
$682.82 for the indebtedness already incurred, and be allowed
out of the principal fund of $3,683 for the future support of the
children. This prayer was granted, but it was granted, as the
case manifestly shows, upon the basis of the whole of the interest
having been applied by the mother for the support of herself
and the children, and that her own inability to support them
rendered it necessary, and there was no order that she should be
paid beyond the amount for which she had run in debt, and,
even as to that, it was ordered that the justness and truth of this
charge for past maintenance should be inquired into. The case
is no authority for the general position that a widowed mother
is, without regard to her own ability and the children's fortune,
entitled to be reimbursed for the whole of any reasonable ex-
penditure she may make for the support of her children. On
the contrary, her ability was inquired into and shown to be
exhausted.

So with *Bruin* v. *Knott*, 1 *Phil. 571*. No question was there
raised as to the mother being entitled to reimbursement for the
support of her son lately deceased. Both acquired handsome
fortunes from the mother's husband, the father of the son, and
the son was besides entitled to other property, both real and per-
sonal, to a large amount. It was evidently not a case in which
there could be any pretence that the mother ought to contribute
anything toward the support of her son, and the only question
discussed was whether, in fixing the allowance to be made to

Alling *v.* Alling.

her, she should be allowed for what his support should have cost if furnished according to his fortune, or for what she had actually expended, which was alleged to be less. The lord-chancellor held that the inquiry should be, what was the scale of expenditure on which the child was maintained, and what would be proper to be allowed in respect to it, having regard to the amount of the child's fortune. And (at *p. 575*) he said : " If the mother has maintained her child on a scale corresponding with his fortune, she will be allowed it. If she has not gone so far, she will be allowed only what she actually expended." Then follows what is probably relied upon as a statement of a general principle : " The principle is that the mother is entitled to a complete indemnity for the money actually expended on her child's maintenance, within proper limits, but nothing more." But I do not understand, and the case and context forbid the inference, that the lord-chancellor, in using that language, intended to lay down a general principle or canon, applicable generally to cases between widow and child, but he evidently meant only to say that the mother in that particular case and under the particular circumstances of it—not all mothers under all circumstances— was so entitled.

I have already dealt with what was said by Chancellor Kent in his *Commentaries (2 Kent. Com. 190).*

In *Pyatt* v. *Pyatt* the mother had no fortune of her own beyond the trifle received from her husband's estate, and whatever of business and earning capacity she had was expended in keeping a home for her children, so that there was not the least ground for throwing upon her any part of the burden of supporting her children beyond what she actually did ; and so manifest was this that the chancellor, in the court below—*17 Stew. Eq. 491* (at *p. 494*)—says : " The testimony strongly indicates that, after the appellant became of full age, there was a tacit understanding between her and her mother, evidenced by her acquiescence in the mother's disposition of her moneys, that the moneys were to be used for the living expenses of the family, and that, to the extent of them, she was to compensate her mother for her maintenance." The principal question litigated

---

Alling *v.* Alling.

---

in the cause was whether the orphans court had jurisdiction to take into account transactions between a mother and daughter occurring after the child became of age, and the principal subject of contention was her support after she became of age.

For these reasons I must decline to consider *Pyatt* v. *Pyatt* as binding authority for the position that a widowed mother is entitled, without regard to her own ability, to full compensation and indemnity from her child's estate for support and maintenance rendered to it during infancy. Such a rule seems to me not to be warranted by the ancient authorities, influenced, as they were, by the general disability of the wife resulting from coverture; much less does it seem in step with the modern *status* of woman under the law and her general emancipation from the artificial restraints of her previous condition and her ability to enter upon many pursuits, once closed to her. On the contrary, I think that, in determining how much the widowed mother is to be allowed, we must take into consideration, as in all cases, all the circumstances—the mother's capacity and ability and the child's fortune. For instance, it would be monstrous, I think, to hold that if a widowed mother was entitled in her own right to a fortune of $20,000, or had a fixed income of $2,000 a year, and had an only daughter, an infant, entitled to a fortune of $5,000, and should educate and support her daughter during infancy in a style commensurate with her own fortune, she should be entitled to call upon that child when she came of age for all the expense of her support and education, though it might far exceed the child's fortune. And I think the result would be much the same if the mother had a well-established earning ability to the same extent.

I proceed, then, to inquire what will be a proper allowance for the mother in this case. And, first, from February, 1887, until April, 1890. The mother demands, during that period, as follows, approximately:

| | |
|---|---|
| Board | $1,400 |
| Washing | 190 |
| Clothing | 460 |

Alling *v.* Alling.

| | |
|---|---|
| Music | $190 |
| Dentistry | 212 |
| Traveling expenses | 120 |
| | $2,572 |

or $800 a year. But she kept no account up to January 1st, 1890. The actual cost is a matter of recollection and estimate, except as to music and dentistry.

Now, as before remarked, it is quite clear that the court can now only make such order as it would have made then. The child had no income but had a prospective fortune of nearly $8,000. There could have been no expectation of a legacy from her uncle.

*Chaplin* v. *Chaplin, 3 P. Wms. 365,* was a suit by children against their mother, a widow, for an account of the personal estate and rents and profits of the real estate which she had received as their guardian. By the will of their father, the son and daughter had a small income, but after his death, by a contingency that had happened, they became entitled to an ample fortune from another source. The mother claimed an allowance for the support and maintenance of the daughter, the son having died, based upon the amount of her fortune as increased by the contingency; but the lord-chancellor held that the allowance to be made to the mother for maintenance must have regard to what the daughter was entitled to at the death of their father, and until the contingency happened the allowance should not exceed the income of their original portions.

All the cases show that the court is, in all circumstances, loath to break into the principal of the estate. But in this case, if application had been made in 1887, the court, as I think, would have undoubtedly done it, but it would have inquired into the capacity of the mother. She had, substantially, no separate estate of her own except her prospective share in her husband's, but she had an earning capacity of from $1,600 to $1,800 a year, which she had exercised freely and voluntarily for her child, and with such success that she was able, up to that time, to support her without at all running in debt. Neverthless, I

think that it would be a hardship on the mother to say that, for that reason, she should not have anything for herself, and I am disposed to allow her $350 a year up to the time when the probate of the will of the uncle vested in the daughter her share in his estate. Up to that time she had merely boarded and clothed her and had paid nothing for her education except for music, and I think her charges for board &c. are rather extravagant. The rule is that a parent or guardian shall not make the least profit out of the child or ward, and I think the sum named will come quite near to being an actual compensation for all moneys paid out up to April, 1890. From that time on I think the allowance should be, if practicable, confined to the amount of the interest on her net fortune. The sum above mentioned— $14,000—will be reduced by the amount of about $1,100 or $1,200 to be allowed out of the principal before she began to receive the benefit of the interest upon it, which would leave less than $13,000. The interest on that, I presume, after paying taxes and expenses, would amount to about $600 a year. During that period—from 1890 to 1893—the annual expense of education and support was at its greatest, amounting, for tuition alone, to $350 a year, besides the increased cost of dress &c. incidental to attending for two years a fashionable finishing school. The charges for the three years of 1890, 1891 and 1892 aggregate $3,700 or over $1,200 per year. In looking over the account I find that the child was maintained in a style which, in my judgment, was quite beyond her pecuniary expectations, and I cannot approve its payment out of her fortune. If the mother chose to support her in such style, I think she must pay a part of the expense from her own income, which was nearly three times that of the child.

I will allow from April, 1890, to the filing of the bill, $800 a year. She stopped going to school in 1892, and the mother was relieved of that charge. From the date of the filing of the bill I think she should live on the interest.

I will advise an order referring it to a master to state the account of the complainant as administratrix of her husband's estate, in which she shall be credited as above.