In the Matter of the Estate of DAVID J. HAYWARD, Deceased, and LORETTA G. HAYWARD, Also Known as LAURA HAYWARD, Deceased.

Surrogate's Court, Kings County, April 12, 1932.

*Moyles & Butler*, for the objectants.

*Jesse C. Rogers*, for the petitioner.

WINGATE, S. Despite the obvious inference from Kipling's familiar dictum, the common law, as presently administered, recognizes no presumption of survivorship where a man and a woman die as the result of a common disaster.

" It is true that the Roman law did recognize a presumption of survivorship in such cases, viz., that the one presumably stronger by reason of age survived the one presumably weaker. And the French laws made like distinction between the sexes, presuming, in the absence of any evidence, that the male survived the female." (*Balder* v. *Middeke*, 92 Ill. App. 227, 229.) In some early English cases, also (*Taylor* v. *Diplock*, 2 Phill. 261; *Colvin* v. *The King's*

*Proctor*, 1 Hagg. Eccl. 92; *Selwyn's Case*, 3 id. 748), " It appears to have been supposed, in the absence of any evidence to justify a different conclusion, that the court would be bound to presume survivorship in the husband, where the husband and wife perish together at sea, upon the ground that the strength of the male would probably enable him to sustain life the longest in such a calamity." (*Stinde* v. *Goodrich*, 3 Redf. Sur. 87, 89.) (See, also, *Newell* v. *Nichols*, 75 N. Y. 78, 89.)

It is now, however, firmly established that in such a case " there is no presumption either of survivorship or simultaneous death." (*McGowin* v. *Menken*, 223 N. Y. 509, 511; *Matter of Fowles*, 222 id. 222, 229; *St. John* v. *Andrews Inst.*, 191 id. 254, 272; *Newell* v. *Nichols*, 75 id. 78, 89; *Moehring* v. *Mitchell*, 1 Barb. Ch. 264, 270; affd., *Moehring* v. *Thayer*, How. App. Cases, 502; *Matter of Englebirt*, 184 App. Div. 314; *Matter of McInnes*, 119 id. 440, 441; *Matter of Hamner*, 101 Misc. 351, 356.)

It follows, therefore, that whenever a question of survivorship under such circumstances is an important issue, the decision must follow the usual procedural rules, imposing upon the litigant whose success depends upon a demonstration that a certain one of the victims of the common disaster survived the other, the burden of proving such fact by a fair preponderance of the evidence, unaided by any presumption in his favor and unhandicapped by a contrary one.

In such an effort, inferences of fact from demonstrated circumstances may play a role of more than average importance, as, indeed, is true of any vital question in which no direct evidence is possible. In other words, in most cases of this type, circumstantial evidence is alone available. The nature and qualities of such evidence are stated with especial clarity in *Ruppert* v. *Brooklyn Heights R. R. Co.* (154 N. Y. 90, at p. 93): " It is entirely true that a material fact in a civil or criminal action may be established by circumstantial evidence, but the circumstances must be such as to lead fairly and reasonably to the conclusion sought to be established and to exclude any other hypothesis fairly and reasonably. It has been said that circumstantial evidence consists in reasoning from facts which are known or proved, in order to establish such as are conjectured to exist, but the process is fatally vicious if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture (*People* v. *Kennedy*, 32 N. Y. 141).

" In order to prove a fact by circumstances there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and

not left to rest in conjecture, and when shown it must appear that the inference sought is the only one which can fairly and reasonably be drawn from these facts (*People* v. *Harris*, 136 N. Y. 429)."

Similar statements may be found in *People* v. *Scharf* (217 N. Y. 204, 210, 211); *Shultz* v. *Hoagland* (85 id. 464, 467); *Baulec* v. *N. Y. & H. R. R. Co.* (59 id. 356, 366); *O'Reilly* v. *Brooklyn Heights R. R. Co.* (82 App. Div. 492, 493).

" When inferences are * * * clearly consistent, the one with liability and the other with no cause of action, the plaintiff has not met the burden which the law places upon her." (*Ford* v. *McAdoo*, 231 N. Y. 155, 162.) " It is not enough to create a suspicion of wrong, nor should a jury be permitted 'to guess at the truth." (*Jaeger* v. *Kelley*, 52 N. Y. 274, 276.)

The vital question in the case at bar, therefore, is whether the demonstrated facts plus the logical inferences to be deduced therefrom, are sufficient to indicate the preponderant probability that Loretta G. Hayward predeceased David J. Hayward.

The facts as proved on the hearings are that these two persons were husband and wife, each about sixty-two years of age. On November 20, 1931, they moved into a third-floor apartment of the premises 79 South Sixth street, Brooklyn. At about ten-forty P. M. on the following evening an odor of illuminating gas was noticed by other tenants in the building, who notified the landlady. Upon her entering the apartment both were dead. The wife was lying on the floor of the kitchen with her feet toward the gas range from an oven of which a full stream of gas was flowing. She was completely clothed. Her body was cold and rigor mortis had set in. The husband was found in bed in the bedroom dressed in his underclothes. His body was partially warm and his arm flexible. All the windows in the apartment were closed but the doors between the three rooms were open. On the table in the kitchen was certain food in a paper, and a frying pan and coffee pot were on the stove. The woman's hat and coat were on a sofa in the living room of the apartment.

A call was immediately sent for an ambulance, and on its arrival the ambulance surgeon made an examination of both bodies, which confirmed the statements of the landlady respecting the condition in which she had found them. He testified that the extremities of the man were quite warm and that, although he was pulseless, he considered artificial respiration potentially helpful. This was tried in vain.

One of the witnesses on the trial made a diagram of the rooms, from which it appeared that the only entrance door to the apart-

ment, from the outer hall, was into the kitchen. The dimensions of this room were fourteen feet long by five feet six inches wide. The kitchen opened into the living room, which was twelve feet five inches by sixteen feet three inches. The bedroom opened from this, and was sixteen feet three inches by eleven feet five and one-half inches. The distance from the stove from which the gas was escaping to the door between the kitchen and the living room was five feet three inches. The distance from this door diagonally across the living room to the door of the bedroom was eleven feet. The distance from the door of the bedroom to the bed on which the man's body was found was nine feet ten inches. In other words, whereas the woman was lying with her feet almost touching the stove, the man's body was over twenty-six feet distant from it.

The ambulance surgeon testified that, in his opinion, the wife had predeceased the husband and this opinion was also voiced by Dr. Ruger, the assistant medical examiner of the city of New York, who testified to considerable experience with death cases from gas. An expert called by the respondents stated in answer to a hypothetical question that an examination of the bodies could not disclose which of the two individuals died first, and that neither rigor mortis nor flaccidity was of any value as a test in such matters, since it varied with conditions and individuals. He further stated that the question of which individual first died would depend on the one who had inhaled the greater amount of the illuminating gas.

As has been noted, there is no presumption in the law that either of the individuals, by reason of sex or otherwise, had greater powers of resistance than the other. There is, further, no presumption than either was not in all respects a normal individual. Indeed, it has frequently been held to be " a presumption of law of universal application that individuals of both sexes are presumed normal so far at least as natural functions of the body or organs are concerned until the contrary is made to appear." (*Harris* v. *Ogden Steam Laundry Co.*, 39 Utah, 436, 444.) (See, also, *Vansandt* v. *Brewer*, 209 Ala. 131, 133; *Green* v. *Southern Pacific Co.*, 122 Cal. 563, 568; *Frazer* v. *South & North Ala. Railroad*, 81 Ala. 185, 196; *Tanner* v. *Louisville & Nashville R. R. Co.*, 60 id. 621; *Louisville & Nashville R. R. Co.* v. *Black*, 89 id. 313; *Dallas* v. *De Yoe*, 53 Cal. App. 452, 457.)

As was testified on the trial, and as was noted by the court in *Matter of Engelbirt* (184 App. Div. 314, 315), the injurious effect of the inhalation of illuminating gas, which is lighter than air, results from a displacing of the oxygen in the red corpuscles of the blood by carbon monoxide from the illuminating gas.

In the noted absence of any legal presumption of greater powers

of resistance in two individuals, both subjected to the fumes of illuminating gas, it is obvious, as stated by the experts for both parties, that the one who would first succumb to its effects would be the person who had inhaled it in greater amount. In other words, that person would first die who was subjected to the greater exposure to the poison contained in the gas.

Such greater exposure could arise in two and only two ways, namely, *first*, by reason of having been subjected to the gas for a longer period; or, *second*, by reason of having been subjected for a like period to gas fumes of greater density and potency.

Since both individuals in this case were found dead in the apartment together, the only way in which one could have been subjected to longer exposure to the gas than the other would have been by reason of the absence from the apartment of such other for a portion of the period during which the first individual was subject to exposure.

The demonstrated facts indicate conclusively that if either individual was absent from the apartment while the gas was escaping, it must have been the woman, since when the bodies were found she was fully clothed, while he was undressed and in bed.

If, however, the escape of the gas began while the woman was outside the apartment, she must inevitably have become aware of that fact upon re-entering the apartment from the outer air.

It is common knowledge, of which the court may take judicial notice, that illuminating gas has a pungent odor, which would be immediately discernible to a person coming into it from the outer air which was not so impregnated. This would be especially true under the demonstrated facts of this case, since the only entrance door of the apartment led into the kitchen where the gas outlet was located, and which, therefore, would be filled with gas to a superlative degree before the air of a locality two rooms distant would have become impregnated with the poison to an extent which would be dangerous to life.

If, therefore, the woman came to the door of the kitchen and found that room even partially filled with gas she would immediately have become aware of it, and if the amount which was escaping was sufficient to be dangerous, she would have done one of four and only four things, namely, *first*, go to the stove to turn off the gas; *second*, run out into the hall to give the alarm; *third*, run to open the windows, or *fourth*, run to her husband. It is conceivable that in the adoption of any except the second stated alternative, she might have been overcome by the gas during the performance of the act, but it is obvious that this eventuality did not occur. The disaster happened late in November. Naturally a woman

going out of the apartment on an errand at such a time would wear her coat and hat, and that this decedent was accustomed to do so is demonstrated by the fact that her coat and hat were found on the sofa in the living room. If, however, the woman had been out of the apartment when the escape of gas began, and came into the most exposed room at a time when the comparatively remote location of the man was dangerously filled with gas, it is inconceivable that she would have taken off these articles of clothing before opening the window or turning off the gas, and yet these garments were not on her person when her body was discovered, but were found on a sofa in the second room, which she could not have reached without passing through the kitchen.

It must, therefore, follow as a matter of logical deduction that the gas in the range could not have been turned on at a time while she was absent from the apartment, with the further consequence that the husband could not have been subjected to its influence for a longer period than the wife.

If, however, the escaping of the gas began at a time when they were together in the apartment, the second alternative, of intensity of subjection to the poison, becomes the controlling consideration. An analysis of the size, dimensions and layout of the apartment as indicated by the diagram made by the witness Bender, demonstrates that there was no place in the apartment where the woman could have been which was further distant from the point at which the gas was escaping than the bed on which the body of the husband was found lying. It, therefore, follows that if the wife was in any place in the apartment except lying on the bed with her husband, she would have been subjected to a greater degree of exposure to the gas than he. Even if she were lying on the bed with him when the gas first began to escape, the fact that at the moment she met her death she had gone into the kitchen, which was the place of greatest danger, proves conclusively that by such act she placed herself more under the influence of the poison, by reason of her approach to its source, than he was in that in which he was found.

The fact that cooking utensils were on the stove and that an open parcel of food was found on the kitchen table raise a logical inference that immediately prior to the time she was overcome she was in the kitchen of the apartment where she would at all times have been subjected to the greatest exposure, wherefore on the statement of the only witness for the respondent that that individual would first die who was subjected to the greater hazard, the conclusion is unescapable that the woman was the first to die, which corresponds with the conclusion of the ambulance surgeon and the medial examiner.

Whereas, therefore, rigor mortis may be no certain indication of prior death, the fact that it was present in her body to a marked degree and that her husband's body was still warm when found, would seem, with the other facts and logical inferences noted, to establish by a fair preponderance of the evidence that the wife was the first to die, and the court so determines.

The petition will, therefore, be granted. Proceed accordingly.