This case was heard by the late Vice-Chancellor Backes, but remained undisposed of at the time of his death. It was then re-referred to me and counsel stipulated that it should be disposed of by me upon the proofs submitted before Vice-Chancellor Backes. Much of the proof was the subject of written stipulation filed in the cause. Some, mainly that touching the death of Archibald McCallum, the insured, his wife, Elizabeth R. McCallum, the named beneficiary in the insurance policy, and William C. McCallum, the eight-year-old son of these two, was the subject of testimony of witnesses. The policy was in the sum of $2,000 and provided that "the net sum payable on the death of the insured shall be paid to Elizabeth R. McCallum, his wife, if living at the death of the insured, otherwise, to the executors, administrators or assigns of the insured."
The amount due on this policy at the time of the death of the insured was $2,139.16 and this amount has been paid into court.
The tragic circumstances out of which this controversy arose are that in the early morning of November 29th, 1932, Archibald McCallum murdered his wife and child, apparently while they were sleeping in bed, and then killed himself. The rights of the respective claimants to the fund paid into court are dependent upon whether the insured husband or the beneficiary wife died first. There were no actual witnesses to the tragedy, but shots were heard by a neighbor and the police were called. A police officer and a neighbor were the first to arrive at the McCallum home which was the scene *Page 507 
of the tragedy; and the ambulance surgeon, Dr. Crabtree, arrived shortly afterward. The bodies of Mrs. McCallum and the child were lying in the bed each with two bullet holes in the head. The bed covers under which they slept had not been disarranged. The body of Mr. McCallum was lying cross-wise on the bed, over the bodies of his wife and child, his lower legs hanging over the side of the bed so that his feet almost touched the floor. There was one bullet hole in his head and a thirty-eight caliber revolver was lying upon the bed. Only one shot was discharged from this revolver. A thirty-two caliber revolver was lying on the dresser near the side of the bed on which the body of the child lay. Five cartridges had been shot from this revolver. It is stipulated that the insured murdered his wife and his son and then committed suicide. Although the bullets which caused the deaths were not recovered (the police officer says they were, but there is no competent proof), the conclusion is inescapable that the insured murdered his wife and child with the thirty-two caliber revolver, laid it upon the dresser, and then shot himself with the thirty-eight caliber gun.
In the briefs submitted, much space is devoted to arguments concerning presumptions of survivorship where the death of two persons occurs in the same disaster, but in view of the conclusion which I have reached, it is unnecessary to discuss the law touching that subject. Suffice it to say that although there was a presumption under the Roman law and the Code Napoleon, varying according to the age and sex of the persons dying in the same calamity, there was no such presumption under the common law (Wing v. Angrave, 8 H.L.C. 183; 11 English Reprints 397), and the common law rule has been uniformly applied in this country except in the states of Louisiana and California. See notes51 L.R.A. 863; 5 A.L.R. 797; Greenl. Evid. (16th ed.) § 30.
Common law rules, in preference to those of the civil law, are uniformly followed in this state; but my attention has not been directed to any New Jersey decision involving this rule of evidence and my own research has disclosed none. But the three deaths which here occurred and which are the subject of this inquiry cannot be said to have resulted from the "same disaster." *Page 508 
While they occurred at approximately the same time they resulted respectively from separate, distinct and succeeding acts of the perpetrator of the crimes. Whether the civil or the common law rule touching the presumption of survivorship prevails in this state need not, therefore, be now determined.
Much space in the briefs is also devoted to arguments touching the existence of a vested property right in a named beneficiary of an insurance policy. Again, in view of the conclusion I have reached, that question need concern us little. It is, however, the law of this state that a person designated as beneficiary in a life insurance policy thereby acquires a vested property right of which he cannot be divested except in the manner provided in the policy. Prudential Insurance Co. v. Swanson, 111 N.J. Eq. 477.
In the instant case, the right of the beneficiary being contingent upon her survivorship, we are not concerned with the rule of law laid down in Brown v. Murray, 54 N.J. Eq. 594,
and In re Grattan, 78 N.J. Eq. 225. The primary question to be here determined is which of two, insured or beneficiary, survived the other. It is claimed that the burden of proof of survivorship rests upon the administrator cum testamento annexo of the insured. There is a conflict of authority on this point but the weight of authority seems to hold that as between the representatives of the first beneficiary and those named as secondary or alternative beneficiaries, the burden of proof of survivorship of the first beneficiary rests upon his representatives; but an examination of these authorities will, I think, show that in those jurisdictions adopting this rule, the first beneficiary does not have a vested interest prior to the death of the insured. McGowin v. Menken, 223 N.Y. 509; Lane
v. De Mets, 59 Hun 462; 13 N.Y. Supp. 347. And generally the question as to who has the burden of proof apparently depends upon the doctrine in the particular jurisdiction as to whether or not the beneficiary took a vested or contingent interest in the fund. Middeke v. Balder, 198 Ill. 590; 64 N.E. Rep. 1002;Fuller v. Linzee, 135 Mass. 468; Dunn v. New AmsterdamCasualty Co., 126 N.Y. Supp. 229; Hildcbrandt v. Ames,27 Tex. Civ. App. 377; 66 S.W. Rep. 128. In *Page 509 United States Casualty Co. v. Kacer, 169 Mo. 301;69 S.W. Rep. 370; 58 L.R.A. 436, and Cowman v. Rogers, 73 Md. 403;21 Atl. Rep. 64; 10 L.R.A. 550, it was held that since the first beneficiary has a vested property right, and there is no presumption of survivorship, the burden of proof of the prior death of the beneficiary is upon those who assert it. And in some jurisdictions even where it is held that the beneficiary does not have a vested right, the burden of proof is on those who assert the beneficiary's prior death. Watkins v. Home Life andAccident Insurance Co., 137 Ark. 207; 208 S.W. Rep. 587. As under our law the beneficiary has a vested right, it would seem that the burden of proof is upon those who assert her prior death — in this case, upon the defendant administrator cum testamentoannexo; but irrespective of who has the burden of proof, I think the proofs submitted are sufficient to support the conclusion at which I have arrived.
On behalf of the defendant Rolston, administrator of the estates of the murdered wife and child, it is insisted that positive proof of the exact time of the death of both insured and beneficiary must be produced; that there being no eye witnesses to this tragedy, and no proof except circumstantial evidence, there is lacking that proof which the law requires; that therefore the burden of proof has not been sustained, and that the legal representatives of the beneficiary are entitled to the fund involved. In support of this argument the language of the lord chancellor in Underwood v. Wing, 4 De G.M. G. 633, "we may guess, or imagine, or fancy, but the law of England requires evidence" is quoted. But the law requires not absolute and direct proof but only such proof as is convincing to the mind of the ordinary reasonable individual. The question is purely one of fact (Greenl. Evid., supra) to be supported according to the usual rules of evidence. Only that evidence which satisfies the ordinary mind is required. Circumstantial evidence, if convincing, is as good and effective as direct evidence. Sometimes it is more reliable than that of eye witnesses. In the instant case, the court, sitting as both judge and jury, can require only that evidence which is satisfactorily convincing, and I think that *Page 510 
the evidence here leaves no room for doubt as to which of these victims of the tragedy survived the others. Circumstances inescapably point to murder and suicide. They just as inescapably point to the death of the murdered before the death of the murderer. It is stipulated that the insured "murdered" his wife and child; and "committed suicide." The murder was not complete until the victims were dead. Obviously, under the stipulation, the suicide occurred after the murder. But, not to be captious, let us examine the evidence touching this inquiry. All witnesses agree that at the time of the arrival of the police officer, Dr. Crabtree, the ambulance surgeon, and Dr. Brokaw, the county physician, all three of the victims were dead, but rigor mortis
had not set in. Dr. Crabtree, the first physician to see the bodies, speaking of the wounds of the three victims, said: "I believe either one would be sufficient to produce instant death and could do so." To the court's question: "Could, for instance, the woman, with the shots as you observed them, have lived after that time — after the shots? Could she have survived for some period?" Answer: "I believe not." Question: "She could have lived some time, could she?" Answer: "Not from the facts that I observed."
Dr. Crabtree also said Mrs. McCallum's death was a matter of seconds rather than of minutes. Question: "It would have been within a minute?" Answer: "I feel so."
He also said that the death of all occurred a matter of seconds after the shots. Answer: "I believe that the duration of life would be quite brief. I am speaking again in seconds. I believe the duration of life would be very brief after such a wound."
Dr. Brokaw, the county physician who arrived shortly after Dr. Crabtree, said that death might have occurred instantly and that he reached the "conclusion that death was apparently instantaneous." Question by the court: "Tell me, then, the great probability is that the wife died instantly, isn't it?" Answer: "That is my feeling and was my feeling at the time."
Dr. Horre would express no opinion as to the "probability" of instant death or the length of life after the infliction of *Page 511 
the wounds. Dr. Horre is the assistant county physician. He did not see the bodies until after they were removed to the morgue where he made his examination.
Dr. Beisler did not see the bodies at all. He testified on the basis of the testimony of Drs. Horre and Brokaw which he heard given in open court. He said that the death of Mrs. McCallum was a question of minutes, not over two minutes. He later said that he could express no opinion as to the probable time of death, but fixed the outside limit of her survival of the wound as twenty minutes. His testimony is of very little value because he dealt solely in possibilities and not probabilities. But his opinion was applicable to all three as well as to the beneficiary, and the same may be said as to the opinion of all witnesses. The wounds of all the victims were equally fatal and if one, the first, survived "a matter of seconds," or of minutes, it is reasonable to assume that the succeeding victims would likewise survive the same number of seconds or minutes. The deaths of the respective victims would thus have occurred one after the other in the order in which they were shot — the first victim dying first, the last victim dying last.
The testimony which is here entitled to the most weight is that of Dr. Crabtree and Dr. Brokaw, who saw the bodies of the three victims immediately after death, and while they were still in the positions in which they died. Indicative also of the instantaneous death of Mrs McCallum is the fact that the bed covers had not been disarranged; there was no evidence of her having made the slightest movement after she was shot, and there was no expression of fear, fright, or, indeed, of any agitation, on her face; she appeared "just as if she was sleeping, very calm and peaceful."
It is suggested that the record indicates that at the conclusion of the final hearing the court was not satisfied with the proofs touching the survivorship of the insured or the beneficiary and that I should now be guided by that indication. I have examined the record with care and I find nothing in it to indicate either satisfaction or dissatisfaction of the court with the proofs. It shows a searching examination of witnesses by the distinguished vice-chancellor who heard *Page 512 
the evidence; but it cannot be assumed that he had formed any opinion one way or the other on the important question involved; and if he had reached any such conclusion he could have then expressed it and disposed of the controversy from the bench. This he did not do. Under the circumstances I cannot substitute thesupposed judgment of the vice-chancellor who heard the case for my own. My conclusion is that the insured survived the beneficiary.
But counsel for the administrator of the murdered beneficiary insists that irrespective of which of the two, insured or beneficiary, survived the other, the administrator cumtestamento annexo of the insured is not entitled to the fund because its claim rests upon a felonious act, the murder of the beneficiary of the insured. This contention is based upon the fundamental maxim of the common law that no man shall found a claim upon his own iniquity, or acquire property by his own crime. Riggs v. Palmer, 115 N.Y. 506; 22 N.E. Rep. 188;5 L.R.A. 340. It is also a maxim of the civil law that one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered. Code Napoleon § 727. "The rule may be considered as generally and entirely settled" and it is the law of this state. Merrity v. Prudential Insurance Co.,110 N.J. Law 414; Swavely v. Prudential Insurance Co., 10 N.J.Mis. R. 1. This argument was advanced at the final hearing and is repeated in the briefs. The rule is one of public policy and it would seem that the point taken was effectively disposed of at the final hearing when the court said: "The estate can't be deprived on that theory. Public policy is based upon the theory that the murderer himself intends to enjoy and that that is the reason he murdered; but where he could have no enjoyment out of it, he could not have had the intent. The rule of public policy doesn't apply at all." Except for the fact that the point is argued at some length in the briefs, the quoted comment of the court would suffice; but to supplement what the court then said I may suggest that as the rule is one of public policy, based upon the theory that to permit a murderer to profit by his felonious act, would be to put a premium upon murder and thus encourage crime, when the reason for *Page 513 
the application of the rule does not exist the rule cannot be invoked. Young v. Weber, 117 N.J. Eq. 242. Besides theSwaverly and Merrity Cases cited above there will be found numerous decisions in other jurisdictions to the same effect; but I have been referred to but one case where the beneficiary of a policy was murdered by the insured and the insured's legal representatives claimed the proceeds of the policy. That case isBox, Administrator, v. Lanier, Administrator, 112 Tenn. 393;79 S.W. Rep. 1042; 64 L.R.A. 458, but it has no application here. In that case, the insured killed his wife, who was the beneficiary under his policy, and then committed suicide. The legal representatives of both husband and wife claimed the proceeds of the policy. The court found that as beneficiary the wife had a vested right under the policy defeasible only upon her dying first; that there was in addition a parole assignment to the wife of the insured's contingent interest in the policy; and that whatever right was acquired on her death was by virtue of his right as surviving husband, and not under the terms of the policy. In holding that his administrators were not entitled to the proceeds of the policy the court merely applied the settled rule that no man shall be permitted to acquire property as the result of his own crime. The Swavely and Merrity Cases,supra, are also cited by counsel in support of this argument, but they are not in point. Here the insured did not gain by his wrongful act. Until he died the policies were not payable and the rights of his administrators came into being only on his death without relation to the death of the beneficiary. No benefit inured to him by the taking of the life of the beneficiary because he had a right under the terms of the policy to change the beneficiary at will. To say that the object of the murder was to accomplish what could be accomplished by the mere scratch of a pen carries its own refutation and leads to the conclusion that profit via the policy was not the object of the crime. The reason for the application of the rule failing, the rule cannot be invoked. I will advise a decree directing that the fund be paid to the Elizabeth Trust Company, administrator cum testamentoannexo of the insured. *Page 514