This is the most gruesome case ever before me. At twelve-thirteen A.M. on September 19th, 1935, the police headquarters *Page 464 
telephone operator in Newark received a call and heard a voice say, "I have just killed three men at 938 South Twentieth street, come and get me," or words to that effect. Within seven minutes a half-score of policemen, detectives and physicians were breaking down the door of a second floor apartment at that address, where they found four men shot to death. Three of them were sprawled on the kitchen floor and the fourth, the murderer of the other three, was lying on a couch in an adjoining room, a suicide. All had been shot with a sawed-off six-shooter repeating shotgun which was lying on the floor beside the couch on which the suicide-murderer lay. The deaths had resulted instantly and the bodies were still warm. Rigor mortis had not begun. Each had been the victim of one shot fired at close range. There were three empty shells on the kitchen floor, one empty and two loaded shells in the gun. The dead men were Orlando B. LeVan; his brother, Benjamin LeVan; a nephew by marriage, John S. Geary, and Charles Russell Geary, brother of John, who had murdered the other three. There were no eye-witnesses to this multiple tragedy and the first knowledge of it came with the telephone call to the police station.
Orlando left a will naming his wife, Kate, or, in the event of her prior death, his nephew, John, beneficiary. His only next of kin is a surviving brother, Joseph H. LeVan. John was survived by his brother, Charles, who immediately committed suicide, and by his brother, Harold, who has been appointed administrator of his estate. Who takes the $20,000 estate of Orlando depends upon whether he or John died first, and that is the sole question to be here determined. If Orlando died first, John's administrator takes; but if John first expired, Orlando's brother inherits. The known facts touching this tragedy are that Charles Russell Geary left his home in Tobyhanna, Pennsylvania, about four P.M. on September 18th, 1935, in a borrowed automobile, telling his wife he was going to Newark to see his Uncle Orlando, and that he would return soon. About nine o'clock that evening he joined Benjamin LeVan in a Newark saloon where they remained talking and drinking until about eleven-thirty *Page 465 
P.M., when they left together. Neither of them was again seen alive. The automobile was found parked in the rear of the LeVan home. A back stairway leads from the yard to the second floor and a small foyer of the LeVan apartment. From this foyer a door opens into the kitchen where the three murdered men were found. The kitchen is about eight by twelve feet. The body of Orlando lay sprawled near the center of the room, face downward, in front of the door leading to the dining room, his head under a chair, his unshod right foot under the table and the other doubled under his right leg. Benjamin was in a partly kneeling position across the threshold of the door leading from the kitchen to the dining room, directly opposite the door from the hall to the kitchen, and a matter of inches from Orlando. John was lying on his face to the extreme left side of the kitchen near the radiator and with his feet and legs entirely under the table. The furniture was not disarranged and there was no evidence of a struggle. The unexploded gun shells each contained nine buckshot. Both Orlando and John had been shot in the back with a gun the muzzle of which was not more than three to six inches distant as evidenced by powder marks and burns. Some of the slugs had gone clean through the bodies — others lodged therein. Benjamin was shot in the left side of his chest, a few inches to the left of the left nipple and some of the slugs had gone clean through his body and out on his right side. The gun was more than a foot distant from his body when fired. There were no powder marks or burns. All had been shot through the heart. The wounds of John and Orlando were of about the same size — one inch in diameter, and were accompanied by like powder marks; that in Benjamin's side was the largest of the three, with a maximum diameter of two and one-half inches, and a minimum of one and one-half inches. Evidently the shots which killed John and Orlando were fired from a point equally distant from both, and that which killed Benjamin was fired a further distance away — not closer than one foot.
Shortly after this tragedy the murderer's widow found, at her home, amongst some insurance papers, an undated letter of which the following is a copy: *Page 466 
"Dear Dorothy:
Just a few lines to let you know the gun I bought I planned to kill Aunt Kate Uncle Orlie as they spoiled the lives 
happiness of our lives also Johns Mother many others. Dont think I went mad I planned this all only God took Aunt Kate before I got a chance. If she would have lived she would have been shot the day she went to go home. Uncle Orlie with her. They were planing on moving Beulah after promising Mother to let her lay at rest beside her Show this letter to John and ask him not to break his Mothers promise. Mother cried many times the way Aunt Kate and Uncle Orlie were useing John. They did not want him when he had no work and could not use him. Dorothy when I am dead have Russ Frey bury me in the cloths I have home. Bury me from Tobyhanna Pine Grove Cottage Coffin like Mothers, No flowers look after Kate. Adaliade has a husband Dorothy don't weap over me unless you begrudge me the rest, So Long all of you. My last wish is that you enjoy yourself as you have been wonderful for putting up with me for as long as you did.
 Good Bye CHARLES RUSSELL GEARY."
The letter is in the handwriting of, and signed by, the suicide-murderer.
These are all the known facts pertinent to this inquiry. It is stipulated that "Charles Russell Geary fired one or more of the shots in the kitchen in the direction of the wall separating said kitchen from the dining room."
The advisory master to whom this matter was referred by the Essex county orphans court found that Orlando had predeceased John and awarded the estate to John's administrator. He based his finding upon the theory that when Charles Russell Geary left his home at Tobyhanna he did so with the definite intention of killing Orlando; that there was no evidence of any intention to harm his brother John; that there was no evidence of any ill-feeling toward anyone other than Orlando; that the three fatal shots in the kitchen were fired from a point near the center of the room but towards the back entrance; that the murderer "entered from the rear and the person directly in his path was Orlando; that he shot him first is most probable and reasonable — the probabilities are that from the spot where Orlando fell, with the dimensions of the kitchen, the location of the furniture, the length of the gun, one or two steps were sufficient to bring his gun *Page 467 
within one foot or less of the body of his brother when the killing mania broke forth; turning, he shot Benjamin as he attempted to escape into the dining room." From the decree of the Essex county orphans court entered pursuant to this finding an appeal was taken to this court.
In this court, the trial is de novo, notwithstanding it be on the record below. Rusling v. Rusling, 36 N.J. Eq. 603; Smith
v. Smith, 48 N.J. Eq. 566; In re Koss, 105 N.J. Eq. 29. Here no additional testimony was submitted, but certain facts were stipulated.
The burden of proof touching the survival of Orlando by John is upon those claiming under him. Masonic Temple Association v.Hannum, Executor, 120 N.J. Eq. 183; Newell v. Nichols, 75 N.Y. 78; In re Hayward's Will, 256 N.Y.S. 607; In re Burza's Estate,272 N.Y.S. 248; Middeke v. Balder, 198 Ill. 590. There is no presumption of survivorship in a common disaster. Union CentralLife Insurance Co. v. Elizabeth Trust Co., 119 N.J. Eq. 505;Masonic Temple Association v. Hannum, Executor, supra. The question of survivorship in such cases is one of fact to be determined according to the usual rules of evidence. The law does not require absolute and direct proof of survivorship but only such proof as is convincing to the mind of the ordinary reasonable individual. Union Central Life Insurance Co. v.Elizabeth Trust Co., supra. While this case is not a common disaster case, the same rules of evidence apply. The deaths of Orlando and John resulted from two separate and distinct acts of a common murderer, albeit from shots fired from the same gun. An interval of time sufficient to direct the aim of the weapon from one to the other necessarily elapsed between the two shootings. As the death of each was instantaneous, the only question to be determined is which was first shot? Who can say with certainty? It must be conceded that the conclusion reached by the advisory master is a permissible one, but it is not exclusive. In reHayward's Will, supra. There is no absolute proof, and the result is reached only upon conjecture based upon successive assumptions; but the inferences to be based on permissible assumptions *Page 468 
are as strong one way as the other. For instance, it is assumed by the advisory master that Charles Russell Geary entered the apartment from the rear, evidently by way of the back stairway; but the door to this stairway was locked when Officer Flynn tried to enter by that means. It is also assumed that Geary stood near the center of the room when he fired the three shots. Who can say? But assuming that this theory is correct, can there be any positive conclusion as to the direction of the first shot? Can the workings of the mind of a murdering maniac be assumed with any degree of certainty? I think not. When a murder-mad man breaks loose, neither reason nor probabilities govern. The evidence shows that the officers had to break down the front door to gain entrance. The back door was also fastened. The four were evidently locked in the apartment when the multiple crime was committed — or did the murderer carefully lock all the doors afterward and before he committed suicide? But upon what basis can it be conclusively assumed that the murderer entered the apartment through the kitchen door? Or that he entered alone with gun in hand and immediately began his shooting? Only about a half hour before, he had left the saloon in company with Benjamin. May they not have entered the apartment together by the front door? May they not all have sat at the table and drunk coffee before the carnage began? There was one coffee cup on the table, others in the sink. Is it beyond reason that the madman could dissemble at first and then take his associates unawares when his mania burst? True, as the advisory master found, there was no evidence of any intention to harm his brother John — but he killed him; nor Benjamin, but he also fell a victim to the madman's rage. Upon what sure basis can it be said that John was first murdered and that Charles then "turning shot Benjamin as he attempted to escape?" Or that John was shot after Orlando? Given all the admitted facts we grope blindly for the answer. But it is elusive, and we can only guess what it is. This does not satisfy the law, especially where one guess is as good as another.
The fallacy of the reasoning of the court below is readily *Page 469 
seen if we analyze the facts upon which its conclusion is based. The known facts have been hereinabove recited. The following assumed facts are mere conjectures:
1. That Charles entered the apartment from the rear.
2. That the person directly in his path was Orlando.
3. That Orlando was first shot.
4. That Charles took one or two steps from where he stood when he shot Orlando toward his brother, John, and then shot John.
5. "Turning, he shot Benjamin as he attempted to escape into the dining room."
Obviously, conjecture No. 1 is the foundation for 2, 3, 4 and 5, but there is not the slightest evidence to support No. 1. If that falls there is nothing left to support the others. True, it is stipulated that "one or more shots were fired in the direction of the wall separating the kitchen and the dining room" and there are certain bullet marks on the furniture and wall indicating that this is so, but it does not follow which of the fatal shots produced these marks.
The circumstances upon which a conclusion is based must themselves be facts; they are of no value if they in turn are based upon a conjecture or assumption. In re Hayward, supra.
The conclusion reached by the advisory master depended upon the circumstance, among others, that Charles entered through the back door; but, as previously noted, that "circumstance" is itself a mere conjecture and in no sense a fact from which a conclusion might be drawn.
By a similar process the master might well have come to several different conclusions, had he chosen a different "circumstance" or set of "circumstances" for his original premise. For instance, it is known that Benjamin and Charles left the saloon together at about eleven-thirty P.M., and that persons in neighboring apartments heard shots fired at eleven-forty-five P.M. Now the question arises, did Charles and Benjamin go directly from the saloon to the apartment and enter the apartment together? If they did, and the shooting immediately began, as described by the advisory master, how does it happen that Benjamin, as shown by the photographs marked *Page 470 Exhibits 7 and 8, had no coat on when he was shot? Evidently he had been in the apartment long enough to remove his coat — and was the lone cup on the table one used by him after he came in? The time element suggests that the two must have gone directly from the saloon to the apartment and entered together. If they did, and Benjamin had time to remove his coat, as he unquestionably did, the reconstruction of the crime evolved in the orphans court has no foundation, for it assumes that Charles started shooting as soon as he entered the back door and that Benjamin was killed as he was trying to escape into the dining room. They could just as well have entered by the front door, and if they did, who can say in what direction the first shot was fired?
From the position of John's body lying on its face between the table and the radiator, how can it be assumed, as it is, that he stood with his face to the left wall when he was shot? Had he been standing in that position how could he have fallen in the position in which he was found without disturbing the radiator cover or the table cover?
The photograph, Exhibit 11, shows that Charles removed his coat before he lay down on the couch where he committed suicide. The coat lies at the head of the couch between it and an ottoman. Upon a cushion on this ottoman is Charles'(?) cap, and plainly visible on the cap is a package of cigarettes. Did Charles, after committing three deliberate murders, calmly lock all the doors, remove his coat, lie down and smoke a cigarette before telephoning the police? And then lie down on the couch and shoot himself?
To return again to Benjamin, it was concluded that he was shot as he was attempting to escape into the dining room. However, it is equally as probable that when he was shot he was sitting in the chair in the corner between the entrance to the dining room and the door leading to the pantry, and that he fell from that chair in the position in which he was found. As previously noted, he was shot in the left side, some of the slugs passing out through the right side of his body. There appears to be blood on the right arm of the chair; a section of the back of the chair, on the right side, has been shattered *Page 471 
by shot, and there is evidence of a bullet hole in the wall to the left rear of the chair. Bearing in mind that but three shots were fired in that room, and that Benjamin was shot in the left side of the chest, had Benjamin been on his way, running, escaping into the dining room when he was shot, as is assumed, no slugs from that shot could possibly have struck the chair and wall at so low an angle. And if Benjamin was in fact seated in the chair, then the whole theory upon which the determination below was based falls, because it can hardly be supposed that he would sit quietly by while Orlando and John were being murdered. And yet if he was shot last, as was found below, and was seated when shot, this is the inevitable, though unbelievable conclusion to which we are forced. Again we necessarily revert to the final, inescapable conclusion that no one can determine the sequence of events in that kitchen at the time of the multiple murder, and that one theory is as probable as another. Reconstruction of this wholesale crime affords almost limitless opportunities for inductive reasoning as well as the exercise of the imagination.
While the law does not require absolute and direct proof of survivorship in a cause such as this; and circumstantial evidence, if convincing, is as good and effective as direct evidence (Union Central Life Insurance Co. v. Elizabeth TrustCo., supra) yet the circumstances upon which the finding of fact is based must lead reasonably and fairly to that conclusion, and to the exclusion of any other equally fair and reasonable result. In In re Hayward, supra, the rule, quoted fromRuppert v. Brooklyn Heights Railway Co., 154 N.Y. 90, 93;47 N.E. Rep. 972, is laid down as follows:
"It is entirely true that a material fact in a civil or criminal action may be established by circumstantial evidence, but the circumstances must be such as to lead fairly and reasonably to the conclusion sought to be established, and toexclude any other hypothesis fairly and reasonably. It has been said that circumstantial evidence consists in reasoning from facts which are known or proved, in order to establish such as are conjectured to exist, but the process is fatally vicious ifthe circumstance from which we seek to deduce the conclusion *Page 472 depends itself upon conjecture. People v. Kennedy, 32 N.Y. 141.
In order to prove a fact by circumstances, there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture; and when shown, itmust appear that the inference sought is the only one which canfairly and reasonably be drawn from these facts. People v.Harris, 136 N.Y. 429; 33 N.E. Rep. 65." (Italics mine.)
The quotation is from a criminal case, but it was quoted in a civil cause involving the fact of survivorship.
Greenleaf, speaking of circumstantial evidence, says:
"In civil cases, it is sufficient if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove; but in criminal cases it must exclude every other hypothesis but that of the guilt of the party." 1 Gr. Ev. ¶13a.
The weight of modern authority, however, shows that the rule of exclusion is not applied alone in criminal cases. See10 R.C.L. 1007 tit. "Evidence" § 196, and 23 Corp. Jur. ¶ 1792, and authorities there cited.
Professor Wigmore says: "The claimed conclusion from the offered facts must be a probable or a more probable hypothesis, with reference to the possibility of other hypotheses." 1Wigmore (2d ed.) ¶ 38. (But note that this rule relates to "relevancy" and not to "proof." See paragraph 31.)
In Jackson v. Delaware, Lackawanna and Western Railroad Co.
(Court of Errors and Appeals), 111 N.J. Law 487, it was held that "if circumstantial evidence be such as to afford a fair and reasonable presumption of facts inferred it is sufficient. The claimed conclusion from the offered facts must be a probable or a more probable hypothesis, with reference to the possibility of other hypotheses." The last sentence was quoted from Wigmore,supra. And in Belyus v. Wilkinson, Gaddis Co.,115 N.J. Law 43 (at p. 52); affirmed, 116 N.J. Eq. 92, Professor Wigmore is again quoted, and it is said that "the test is probability rather than certainty." See, also, Hercules Powder Co. v.Nieratko, 113 N.J. Law 195; *Page 473 affirmed, 114 N.J. Eq. 254; Kuczynski v. Humphrey,118 N.J. Law 321; Vollkommer v. Menge, 118 N.J. Law 360. There can be no doubt as to the correctness of the rule of evidence laid down in these New Jersey cases, as applied to the problem therein involved. But it will be noted that all of these cases involved an appeal from a verdict of a jury and the question presented was whether or not the jury's verdict could be sustained upon the basis of the evidence before it. On such an appeal it is the uniform rule that the verdict of a jury will not be disturbed if there is sufficient evidence to support its findings; and it is quite plain that in such case "the test is probability rather than certainty." But the question here is not — can the judgment of the court below be supported by the facts before it? The hearing in this court is entirely de novo as in a court of first impression, and the problem involved should be solved without reference to, and uninfluenced by, the action of the court below. The question of whether or not the burden of proof touching survivorship has been sustained depends upon whether or not the evidence, circumstantial or otherwise, is convincing and satisfying to the trier of the fact; and while the conclusion of survivorship need not rest upon an hypothesis which is completely exclusive of every other hypothesis, "the claimed conclusion * * * must be * * * a more probable hypothesis with reference to the possibilities of other hypotheses." Wigmore, supra. This is only another way of saying that the circumstances upon which the finding of fact is based must lead reasonably and fairly to that conclusion, and to the exclusion of any other equally fair and reasonable result.
It seems to me that the evidence here does not satisfy the rule and I am of the opinion that John's administrator has not sustained the burden of proof. Orlando's will was ambulatory until the instant of his death. John's legacy was entirely dependent upon the fact of the prior death of Orlando and the burden of proving that fact was upon John's administrator.
As was said in In re Burza's Estate, supra, "it is impossible to determine the priority of death here and the estate * * * *Page 474 
therefore, passed by operation of law to his next of kin." The same statement applies to the estate of Benjamin LeVan. Orlando, or in the event of his death, Orlando's wife, was the beneficiary under Benjamin's will. The burden of proving the survival of Orlando was upon his representative and that burden has not been sustained. Orlando's wife predeceased both Benjamin and Orlando.
I will advise a decree in accordance with these conclusions. *Page 475