A catastrophe, rather abhorrent and appalling, has occasioned the institution of this cause.
Frank Godown and his wife, Bessie, were married in 1910, and their alliance appears to have been blended with mutual devotion and affection. They resided in a modest home at Flemington, Hunterdon County, New Jersey. Each had achieved the prophetic span of life; he had attained the age of seventy-four and she was in her seventy-first year. In 1926 each executed a last will and testament by which the estate, real and personal, of the one was to be transmitted absolutely to the other. Mrs. Godown devised and bequeathed all of her property to her husband "to him, his heirs and assigns forever, in fee-simple." These are words of limitation and not of substitution. King v. King, 125 N.J. Eq. 94; 4 Atl. Rep. 2d 405. Neither will contains any provision for a gift over in the event of a failure of the devise or bequest to vest in the designated beneficiary.
An interruption of the customary observation of Mr. and Mrs. Godown in and about their home aroused anxiety and on March 2d 1943, peace officers were summoned. Normal entry into the house was not possible, and by means of a ladder ingress was accomplished through a window of the bathroom on the second floor. The lifeless bodies of Mr. and Mrs. Godown were promptly discovered. The police authorities seem to have been satisfied with the supposition that Mr. Godown killed his wife and then committed suicide. Both had suffered mortal wounds.
The complainants are the heirs and next of kin of the deceased lady and they lay claim to her property. The defendants, other than the administrator cum testamento annexo, assert a similar relationship to Mr. Godown and *Page 588 
resist the claims of the complainants. The administrator affects the situation of a neutral stakeholder. The present inquiry is directed to the factual questions: (a) Did Mr. Godown survive his wife; (b) did he feloniously slay her; and if so, then, to the legal or equitable point: (c) Can the heirs and next of kin of Mr. Godown in such circumstances acquire through him the property of his deceased spouse?
The evidence of the killings is, of course, circumstantial. Photographs realistically depict the conditions existing at the time of the discovery of the bodies. The body of Mrs. Godown was found on the floor immediately beside the bed in her bedroom. She was attired in a nightgown and her lower limbs and her feet were encircled by a bed quilt. Her death was caused by a traumatic comminuted fracture of the vertex of the skull producing severe hemorrhages from the ears, nose, and mouth. The evident force of the blow in reasonable probability created immediately upon its infliction a consequent concussion of the brain of a degree sufficient to physically incapacitate her. The injury was in character such as reasonably would be expected to result from the use of an iron bar. An iron bar twenty to twenty-two inches long and weighing twelve to fourteen pounds was observed on the floor under the right shoulder of Mr. Godown in the bedroom in which he succumbed. Foot tracks of blood appeared conspicuously on the floor between the bedrooms. The soles of the heavy socks worn by Mr. Godown were blood-stained. The feet of the wife were not discolored.
The corpse of Mr. Godown was met with in his bedroom. His death was caused by a laceration at the left groin which severed the left femoral artery. On his bed was a penknife with the blood-stained blade opened at a ninety-degree angle. All articles of furniture in the bedrooms and throughout the house were in order and nothing indicated that a struggle had occurred. The circumstances are not productive of inferences of a mutual suicide pact or of the perpetration of the crimes by a third person. The sanity of Mr. Godown is presumed. 20 Am. Jur.
(Ev.) 215. Although the evidence is not abundant, I am persuaded that a felonious uxoricide and a suicide in fact happened. *Page 589 
In like cases, the determination of the survivorship is often perplexing and enigmatic. Cf. In re Le Van, 123 N.J. Eq. 463;198 Atl. Rep. 278; affirmed, 125 N.J. Eq. 92; 4 Atl. Rep. 2d280. Here, the bill charges (paragraph 6) that Mr. Godown survived his wife. The defendants (other than Lott) admit in their answer (paragraph 2) that "Frank Godown died within a short time after the death of Bessie W. Godown." Thus, this material fact is acknowledged by all parties professing to have a beneficial interest in the estate of Mrs. Godown. The admission being favorable to the interests of the infant defendants is therefore competent. Anderson v. Anderson, 133 N.J. Eq. 311;32 Atl. Rep. 2d 83. Methodically, this acquiescence would establish the acquisition by Mr. Godown of the property of his wife pursuant to the terms of her will and in consequence of his death, the property would gravitate to his heirs and next of kin.
The complainants avow that by reason of the homicidal act of Mr. Godown the normal succession of the beneficial ownership of the property of his victim is impeded and that such ownership veers to them. They invoke the policy of the common law that no one should be allowed to profit by his own wrong. The maximnullus commodum capere protest de injuria sua propria, in one or another of its significations, has been accorded a very general application in equity and, indeed, also at law. Merrity
v. Prudential Insurance Co., 110 N.J. Law 414;166 Atl. Rep. 335.
The doctrine itself, so essential to the observance of morality and justice, has been universally recognized in the laws of civilized communities for centuries and is as old as equity. Its sentiment is ageless. Domat, pt. 2 bk. 1; Code Nap. 272;Mackelday's Roman Law, 530; Coke's Littleton 148-B; Broom's LegalMaxims (9th ed.) 197. The permissibility of its application in diversity of the provisions of a will or of statutes of descent or distribution, and the theorization of its legitimate application in such cases have been the subjects of decisions noticeably oppugnant and discordant. Such, also, have been the topics of numerous articles published in our law reviews: 3Harvard Law Review 234; 4 Id. 394; 8 Id. 170; 24 Id. 227;30 Id. 622; 44 Id. 125; 49 Id. 715; *Page 590 Am. Law Reg. 1897; 29 Mich. Law Rev. 745; 6 Univ. of CincinnatiLaw Rev. 469; 47 Law Quarterly Rev. 320; Virginia Law Review
(March, 1933), p. 518; 8 N.Y.U. Law Quarterly Review, No. 3 p.492; lecture of Mr. Justice Cardozo at Yale Law School, 1921, "The Nature of the Judicial Process," Yale University Press, page 40, and numerous others. Authors learned in equity jurisprudence have examined the decisions and announced their convictions: 4Pom. Eq. Jur. (5th ed.), § 1054 (d); 3 Scott on Trusts, § 492; 3 Bogert on Trusts, § 478. The American Law Institute in the Restatement of the Law "Restitution" (§ 187), has also declared the rules deemed to be secure.
Almost a half century ago when there were few reported decisions relative to the subject, Professor James Barr Ames submitted to the legal profession a monograph in which he advocated the more compliant and adaptable rationale that the legal title to the property of the victim passes to the murderer by statute or will, as the case may be, but because of the unconscionable mode of its acquisition, equity will adjudge the murderer to be a constructive trustee of the title for the use of the heirs or next of kin of the victim to whom he should be obliged to transfer and convey the legal title. This principle averts the reproach of permitting a criminal to profit by his perfidy and the censure of an evasion of the statutes of wills, descent or distribution.
In this court, Vice-Chancellor Fielder has heretofore had reason to ascertain the state of the pertinent law. In Sorbello
v. Mangino, 108 N.J. Eq. 292; 155 Atl. Rep. 6, he summarized the three strands of divergent decisions as follows:
"1. The legal title passes to the murderer and may be retained by him in spite of his crime, for all or one of the following reasons: (a) the devolution of property of an intestate is controlled entirely by the statutes of descent and distribution and, in cases of tenancy by the entirety by the nature of the estate as originally created; (b) denial of inheritance to an heir, or to the survivor in case of tenancy by the entirety, because of his crime, is punishment for the crime in addition to his sentence, and (c) would violate the *Page 591 
constitutional provision against corruption of blood.Carpenter's Estate, 170 Pa. 203; Wall v. Pfanschmidt, 265 Ill. 180; McAllister v. Fair, 72 Kan. 533; Beddingfield v. Estill,118 Tenn. 39; Collnik v. Mengel, 112 Minn. 349; In re Kirby,162 Cal. 91; Holloway v. McCormick, 41 Okla. 1; Hagan v.Cone, 21 Ga. App. 416; Eversole v. Eversole, 169 Ky. 793;Shellenberger v. Ransom, 41 Neb. 631.
"2. The legal title will not pass to the murderer because of equitable rules and principles that no one shall be permitted to profit by his own fraud, or take advantage of his own wrong, or found any claim upon his own iniquity, or profit by his own crime. Riggs v. Palmer, 115 N.Y. 506; Perry v. Strawbridge,209 Mo. 621; In re Tyler, 140 Wn. 679.
"3. The legal title passes to the murderer, but equity will treat him as a constructive trustee because of the unconscionable mode of its acquisition and compel him to convey it to the heirs, or next of kin of the deceased, exclusive of the murderer.Ellerson v. Westcott, 148 N.Y. 149; Van Alstyne v. Tuffy,169 N.Y. Supp. 173; In re Santourian's Estate,212 N.Y. Supp. 116; Bryant v. Bryant, 193 N.C. 372; Barnett v. Couey
(Mo.), 27 S.W. Rep. (2d ser.) 757."
In Sherman v. Weber, 113 N.J. Eq. 451; 167 Atl. Rep. 517,
the Vice-Chancellor resolved that the husband murdered his wife and that title to property held by them by the entirety nevertheless vested in him in fee as the survivor (he being the younger), but subject to a trust in favor of the wife's heirs to the extent of the value of her half-interest in the net income of the property for her normal expectancy of life. His reliance upon the equitable and injunctive measures, effectuated by the establishment in invitum of a constructive trust, is vindicated by ample and increasing authorities. His conclusion adheres to the public policy expressed in the equitable maxims of the common law. It is a precedent which I must follow in an analogous case.
It is accordingly determined that the legal title to the property of Mrs. Godown passed to her husband pursuant to the terms of her will and that he immediately became answerable in equity as a trustee ex maleficio, and those acquiring *Page 592 
the legal title through him have since held it as constructive trustees. Equity has jurisdiction in the present cause to reach the property although its legal title has passed to the heirs and next of kin of the wrongdoer. 4 Pom. Eq. Jur. (5th ed.), §1053.
 Decree accordingly. *Page 593