CLARA SMALL, AS ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF LINDA M. ROCKFELD, PLAINTIFF-APPELLANT, v. ROBERT D. ROCKFELD, DEFENDANT-RESPONDENT.

Argued October 8, 1974—Decided December 17, 1974.

232

Mr. *Robert A. Wayne* argued the cause for the appellant (*Messrs. Robinson, Wayne & Greenberg,* attorneys; *Mr. Edward T. O'Donnell,* on the brief).

Mr. *Theodore W. Geiser* argued the cause for the respondent (*Messrs McElroy, Connell, Foley & Geiser,* attorneys; *Mr. William H. Graham,* on the brief).

The opinion of the Court was delivered by

JACOBS, J. The plaintiff Clara Small, as administratrix ad prosequendum of her deceased daughter Linda Rockfeld, brought a wrongful death action in the Law Division against her deceased daughter's surviving spouse the defendant Robert D. Rockfeld. Her complaint charged in its first count that the defendant murdered Linda, and in its second count that he caused her death by conduct which was grossly negligent and was in wanton, reckless disregard of her safety and life. It sought damages allowable under the terms of the Wrongful Death Act (*N. J. S. A.* 2A:31-1 *et seq.*). The defendant filed an answer and in advance of trial moved for judgment on the pleadings, asserting that the plaintiff's action was "barred by operation of the interspousal and intrafamilial immunity doctrines." In the Law Division, Judge Harrison granted the motion. Though he viewed the result as "incongruous" he considered that the common law precedents dictated it and that necessary changes in the law "should

emanate from our Appellate Courts" rather than our trial judges. The plaintiff duly appealed to the Appellate Division and thereafter we granted certification. 65 *N. J.* 579 (1974).

 Both parties agree that at this stage of the proceeding we must accept as true the facts as they are alleged by the plaintiff in her Law Division complaint (*Rappaport v. Nichols*, 31 *N. J.* 188, 193 (1959)); and we judicially notice such pertinent facts as appear in a current Chancery Division proceeding captioned Robert D. Rockfeld, M.D. plaintiff v. Linda M. Rockfeld etc. et als. Linda and Robert were married in January 1970 and their only child Scott David Rockfeld was born in January 1972. In December 1972 Linda, then five months pregnant, accompanied Robert on a trip to Florida. While there he took her out in a small outboard motorboat. The defendant states that the outboard motor fell partially off, that they drifted and were buffeted by large waves, that they then abandoned the motorboat and swam towards shore, and that he made it but she did not. The complaint alleges in one count that the defendant did "wilfully, maliciously and deliberately scheme and plan to kill his wife," that conduct on his part detailed in the complaint was all pursuant to such scheme, and that Linda's death was "a direct consequence and proximate result". The complaint also alleges in a separate count that when the defendant took his wife out in the motorboat he knew or should have known that weather conditions had so deteriorated as to cause the issuance of small craft warnings, that he failed to check the motorboat or its equipment and failed to secure life preservers, that he disregarded warnings not to proceed beyond a designated point, that he caused his wife to leave the motorboat in shark infested waters though he knew she was a poor swimmer and was physically handicapped by her pregnancy, that he "deserted and abandoned his wife in the waters of the Gulf of Mexico and returned to safety alone" and that his conduct was "grossly negligent," was in "wanton, reckless disregard" of her safety and life, and caused her death.

In May 1973 the plaintiff Clara Small was duly appointed as administratrix ad prosequendum of her deceased daughter Linda; earlier the defendant Robert D. Rockfeld had been appointed as general administrator of Linda's estate which approximates $750,000, a gift to her from her parents. In the Chancery Division proceedings the plaintiff and her husband were granted visitation rights with respect to their grandson . Scott David Rockfeld. See *N. J. S. A.* 9:2–7.1. The situation with respect to Scott's residence was summarized by Judge Kimmelman in the Chancery Division as follows: "It appears that since mid-December 1972 Scott David Rockfeld has been residing with his aunt and uncle, Mr. & Mrs. Gerald Dorf, who reside at 2 Kettle Creek Road, Freehold Township, New Jersey. Mrs. Dorf is the sister of the child's father, who is Robert D. Rockfeld. The child's father, Dr. Rockfeld, also resides with his sister and brother-in-law as frequently as it is possible for him to do so. He is currently attached to the medical staff of the hospital in The Bronx as a resident and he is only able to get home, so to speak, to the house of his sister and brother-in-law three or four nights a week. The remainder of the time the evidence shows he spends either at the hospital or at an apartment which he maintains in the New Rochelle area."

Mr. Dorf testified that "Scott has, in effect, become a son of ours"; and the defendant testified that he had discussed with Mr. and Mrs. Dorf the possibility of their adopting Scott as their own son. In this connection Judge Kimmelman, in the course of his determination on visitation, had this to say: "Now, in addition I am somewhat motivated in the ruling I will make by Dr. Rockfeld's statement that there is a possibility some day that his sister and brother-in-law might adopt Scott David Rockfeld. The fact that he expresses in court the possibility that he might surrender his child to his sister and brother-in-law for adoption is a circumstance which I can take into account in considering the extent of the visitation rights which I will allow to the maternal grandparents."

In his brief the defendant recognizes that for the purposes of his motion the allegations of the plaintiff's complaint were necessarily "treated as true" and that the issue now presented to us is "solely one of law." His contention is that, assuming he committed the shocking wrongs alleged in the complaint, he is nonetheless entirely immune from any action under the Wrongful Death Act (*N. J. S. A.* 2A:31–1 *et seq.*) for the resulting damage to the innocent surviving member of the family. He grounds his contention on common law familial immunities which are not mentioned in wrongful death acts and which some courts have held to have no bearing thereon. See *In re Estate of Pickens,* 255 *Ind.* 119, 263 *N. E.* 2d 151 (1970); *Jones v. Pledger,* 363 *F.* 2d 986 (*D. C. Cir.* 1966); *Mosier v. Carney,* 376 *Mich.* 532, 138 *N. W.* 2d 343 (1965); see also *Heyman v. Gordon,* 40 *N. J.* 52 (1963), where conflicting cases on the subject are referred to in the majority and minority opinions. Our Wrongful Death Act creates a new cause of action maintainable by the administrator ad pros. provided the decedent, if he had survived the defendant's wrongful act or neglect, would have been entitled to maintain an action for damages. The cases cited in the *Heyman v. Gordon* opinions divide as to whether this proviso pertains only to the elements in the tort itself, *e. g.,* negligence, contributory negligence, etc., or whether it extends to personal immunities as well. However, we need not pursue this issue for we are satisfied that, in any event, none of the common law immunities may fairly or justly be applied in the cirmumstances at hand to preclude the maintenance of the wrongful death action instituted against the defendant by Linda's administratrix ad pros.

The common law recognized certain immunities which have, however, increasingly come under disfavor. National and state governmental immunity from suit was originally carried over from English law though Dean Prosser notes that it is a bit hard to understand how this "feudal and monarchistic doctrine ever got itself translated into the law

of the new and belligerently democratic republic in America". *Prosser, Law of Torts* § 131 at 971 (*4th ed.* 1971). In our own State there has been persistent judicial whittling, first at the immunities of lower governmental levels and finally at the immunity of the State itself. See *Cloyes v. Delaware Tp.*, 23 *N. J.* 324, 327–330 (1957); *Jackson v. Hankinson and Bd. of Ed. of New Shrewsbury*, 51 *N. J.* 230, 234–235 (1968); *P, T & L Const. Co. v. Comm'r Dept. of Trans.*, 55 *N. J.* 341 (1970); and *Willis v. Dept. of Cons. & Ec. Dev.*, 55 *N. J.* 534 (1970), where this Court, after pointing out (at 538) that "[t]here has been a steady movement away from immunity", held that the State was not immune from a damage action grounded on the State's tortious conduct in negligently failing to erect suitable barriers in High Point Park around a bear which mauled a child's arm requiring its amputation. See Comment, "Judicial Abrogation of Sovereign Immunity in New Jersey: A Prelude to Legislative Reform?", 2 *Seton Hall L. Rev.* 149 (1970); *L.* 1972, *c.* 45; *N. J. S. A.* 59:1–1 *et seq.; Perillo v. Dreher*, 126 *N. J. Super.* 264, 267 (*App. Div.* 1974).

In *Collopy v. Newark Eye and Ear Infirmary*, 27 *N. J.* 29 (1958), this Court abrogated the common law immunity in favor of charitable organizations. We noted that judicial exceptions have been declared from time to time, that the immunity runs counter "to widespread principles which fairly impose liability on those who wrongfully and negligently injure others", and that it "operates harshly and disregards modern concepts of justice and fair dealing". 27 *N. J.* at 47–48. Dean Prosser has collected the cases elsewhere which have similarly abrogated the charitable immunity doctrine and has confidently predicted that "the next two decades will see its virtual disappearance from American law." *Prosser, supra*, § 133 at 996; *cf. N. J. S. A.* 2A:53A–7 *et seq.; Winters v. Jersey City*, 63 *N. J.* 7 (1973); *Tramutola v. Bortone*, 63 *N. J.* 9, 18 (1973).

The common law's interspousal immunity was largely grounded on concepts which admittedly have no place in current thinking. Thus the common law viewed the legal existence of the wife during marriage as having been suspended or at least "incorporated or consolidated into that of the husband." 1 *Blackstone, Commentaries* 442. Under this medieval concept the wife was precluded from maintaining an action against her husband for his wrongful conduct whether it was intentional or negligent, affected her person or property, or occurred before or during the marriage. By the 18th century, equity had developed its own doctrine of the married woman's separate estate under which it entertained various actions by wives against husbands, and in the 19th century comprehensive legislation which was designed to advance the general emancipation of married women was enacted in England and throughout the United States. See *Koplik v. C. P. Trucking Corp.,* 27 *N. J.* 1, 13 (1958) (dissenting opinion).

Despite the foregoing and 20th century · social changes some states still refuse to permit tort actions by a wife against her husband. In the course of his comprehensive discussion of such refusal Dean Prosser said:

> The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy—and this even though she has left him or divorced him for that very ground, and although the same courts refuse to find any disruption of domestic tranquility if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it. *Prosser, supra,* § 122 at 863.

In our own State there has been a recent line of cases which for the most part terminated the interspousal immunity. While in *Koplik v. C. P. Trucking Corp., supra,* 27 *N. J.* 1, the majority still adhered to the immunity,

three members of this Court urged its termination pointing out that the academic world had vigorously attacked it and that an ever increasing number of courts elsewhere had come to reject it. In their dissenting opinion they made the following pertinent comments:

> In general those who favor the majority view no longer seek to support it on the fanciful common law notion that since the spouses are "one person, one cannot sue the other"; instead they now urge that the husband's immunity serves to preserve domestic tranquillity and tends to avoid fraudulent and collusive actions. In the rare instance where the wife will sue her husband despite his objection there is probably not much tranquillity to preserve and in other instances (as here) the husband, protected by insurance, may welcome her action. In any event, it is difficult to see how a personal injury action would disrupt tranquillity more than a property or contract action which is admittedly maintainable. The fear of fraudulent actions, and collusive actions where the husband is insured, furnishes equally tenuous basis for the majority view. There is opportunity for fraud and collusion in many legal proceedings, but our system of courts and juries is very well designed to seek them out and its presence clearly furnishes no just or moral basis for precluding honest and meritorious actions. 27 *N. J.* at 14–15.

In *Long v. Landy,* 35 *N. J.* 44 (1961), the wife sustained injuries as the result of a collision involving a car operated by her husband and a car operated by a stranger. Her husband died and she sued his estate along with the stranger. The legal representative of the husband's estate asserted the interspousal immunity but his motion for judgment grounded thereon was denied. In sustaining the denial, this Court noted without dissent that "[t]he negligent infliction of injury by a husband upon his wife is a wrongful act" and that "[i]t does not lose this quality merely because the wife is prohibited by the common law doctrine from enforcing liability for her damage." 35 *N. J.* at 50. In view of the husband's death the Court concluded that the interspousal action would not violate any policy against marital disharmony and would not entail any significant danger of collusion. 35 *N. J.* at 53.

In *Immer v. Risko*, 56 *N. J.* 482 (1970), the plaintiff was injured while riding in the car of the defendant whom she later married. She sued the defendant on the ground that his negligence caused her injuries but the lower courts held that her suit against her husband was barred by the interspousal immunity. We reversed in an opinion by Justice Proctor which in effect overruled *Koplik* (27 *N. J.* 1), and which unequivocally accepted the arguments in favor of abrogation of the immunity. He pointed out that the original metaphysical basis for the immunity was no longer seriously advanced and that the reasons now advanced by those who still support the immunity are primarily (1) the disruptive effect upon the harmony of the family and (2) the possibility of collusion against the frequent real party in interest, namely, the insurance carrier. 56 *N. J.* at 488.

With respect to the first reason Justice Proctor doubted that the marital relation would be more disturbed by allowing the action than by denying it; as he put it: "Where one's conduct is such that his spouse elects to sue him, if there is no insurance, the damage probably has already been done." 56 *N. J.* at 488. Where there is insurance the danger, if any, is not family disharmony but collusion; on that aspect Justice Proctor noted that the possibility of collusion should not "be deemed sufficient to bar all interspousal tort claims" (56 *N. J.* at 493) since, after all, it is the business of courts to deal with such problems and "we ought not assume the task is too onerous without some basis in experience for the assumption." 56 *N. J.* at 494.

In its ultimate holding *Immer* was limited to the termination of the interspousal immunity in proceedings involving "claims arising out of motor vehicle accidents." 56 *N. J.* at 495. This was done because strictly that was all that was before the Court and the Court was aware that there may still be some special areas in the marital relationship between husband and wife "that courts should not become involved in." 56 *N. J.* at 495. Those special areas may, as

was early pointed out by Professor McCurdy in his article on "Torts Between Persons in Domestic Relation," 43 *Harv. L. Rev.* 1030, 1055 (1930), give rise to privileged actions in the marital relationship and to substantive limitations on causes of action grounded on simple domestic negligence. But obviously those privileges and those limitations have no relationship to the defendant's alleged misconduct here or to the causes of action grounded thereon as set forth in the plaintiff's complaint. The reasoning and tenor of Justice Proctor's opinion in *Immer* leave no room whatever for doubt that he, along with the colleagues who joined him, considered the interspousal immunity to have been effectively terminated in our State in situations, such as the one at hand, that are unconcerned with any marital relationship privilege or simple domestic negligence. 56 *N. J.* at 484–495.

The English common law did not recognize any intrafamilial immunity precluding action by or on behalf of a minor against his wrongdoing parent. See *Prosser, supra,* § 122 at 865; McCurdy, *supra,* 43 *Harv. L. Rev.* at 1059; *Hastings v. Hastings,* 33 *N. J.* 247, 255 (1960) (dissenting opinion). However, in the United States an early Mississippi case did refuse to allow an unemancipated daughter to sue her mother for damages resulting from the alleged malicious imprisoning of the daughter in an insane asylum. *Hewlett v. George,* 68 *Miss.* 703, 9 *So.* 885, 13 *L. R. A.* 682 (1891). The court cited no authority for its holding but took the position that in the interests of the peace and tranquillity of the family, a minor child should be prohibited from suing his parent for personal injuries. *Hewlett* was followed by the Court of Errors and Appeals in *Reingold v. Reingold,* 115 *N. J. L.* 532 (*E. & A.* 1935), which in turn was followed by this Court in *Hastings v. Hastings, supra,* 33 *N. J.* 247. However, *Hastings* was a case which, like *Heyman v. Gordon, supra,* 40 *N. J.* 52, and the other New Jersey cases sustaining the parental immunity, involved only ordinary motor vehicle negligence. In *Hastings* there were three dissenting members who pointed out that the parental immunity had been

universally condemned in the professorial and student writings on the subject (33 *N. J.* at 254), had justly been departed from in varying situations (33 *N. J.* at 260), and had not precluded the contract and property actions which had frequently been instituted between unemancipated minors and their parents with whom they lived and which oftentimes had been grounded on serious charges of parental misconduct. 33 *N. J.* at 259; *In re Flasch,* 51 *N. J. Super.* 1, 29 (*App. Div.*), certif. denied, 28 *N. J.* 35 (1958); *Keeney v. Henning,* 58 *N. J. Eq.* 74 (*Ch.* 1899); *Alling v. Alling,* 52 *N. J. Eq.* 92 (*Ch.* 1893); *Prosser, supra,* § 122 at 865; McCurdy, *supra,* 43 *Harv. L. Rev.* at 1057.

The majority in *Hastings* stressed that at that time no case had been found allowing an action between parent and child "where only simple negligence in a purely family relationship was involved". 33 *N. J.* at 249. However, since that was written, there have been many decisions which have sweepingly abrogated the parental immunity and have allowed intrafamilial actions generally, including suits such as the one dealt with in *Hastings,* namely, suit grounded on the negligent operation of an automobile by the parent resulting in injury to his unemancipated minor child. 33 *N. J.* at 248. See *Prosser, supra,* § 122 at 867–868; *Goller v. While,* 20 *Wis. 2d* 402, 122 *N. W. 2d* 193 (1963); *Gibson v. Gibson,* 3 *Cal. 3d* 914, 92 *Cal. Rptr.* 288, 479 *P. 2d* 648 (1971); see also *Briere v. Briere,* 107 *N. H.* 432, 224 *A. 2d* 588 (1966); *Hebel v. Hebel,* 435 *P. 2d* 8 (*Alaska* 1967); *Nuelle v. Wells,* 154 *N. W. 2d* 364 (*N.D.* 1967); *Silesky v. Kelman,* 281 *Minn.* 431, 161 *N. W. 2d* 631 (1968); *Schenk v. Schenk,* 100 *Ill. App. 2d* 199, 241 *N. E. 2d* 12 (1968); *Gelbman v. Gelbman,* 23 *N. Y. 2d* 434, 297 *N. Y. S. 2d* 529, 245 *N. E. 2d* 192 (1969); *Petersen v. Honolulu,* 51 *Haw.* 484, 462 *P. 2d* 1007 (1970); *Streenz v. Streenz,* 106 *Ariz.* 86, 471 *P. 2d* 282 (1970); *Rigdon v. Rigdon,* 465 *S. W. 2d* 921 (*Ky. Ct. App.* 1971); *Falco v. Pados,* 444 *Pa.* 372, 282 *A. 2d* 351 (1971); *Plumley v. Klein,* 388 *Mich.* 1, 199 *N. W. 2d* 169 (1972); *Rupert v. Stienne,* —— *Nev.* ——, 528 *P. 2d* 1013 (1974).

In *Goller v. White, supra,* the Wisconsin Supreme Court abrogated the parental immunity in an opinion which declared that only in the following exceptional situations may it still be asserted as a defense: "(1) Where the alleged negligent act involves an exercise of parental authority over the child; and (2) Where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." 122 *N. W. 2d* at 198. In *Silesky v. Kelman, supra,* the Minnesota Supreme Court explicitly approved these limited exceptions from its abrogation of parental immunity. 161 *N. W. 2d* at 638. In *Gibson v. Gibson, supra,* the California Supreme Court held broadly that an unemancipated minor child may maintain an action for negligence against his parent. In his opinion for the court, Justice Sullivan dealt with and summarily rejected the arguments advanced in favor of parental immunity. He concluded that the immunity should be abrogated though he recognized that the parent would still not be liable for conduct which amounted to no more than what "an ordinarily reasonable and prudent parent" would have done in similar circumstances. 92 Cal. Rptr. at 293, 479 *P. 2d* at 653. See Note, "The Vestiges of Child-Parent Tort Immunity," 6 *U. Cal. Davis L. Rev.* 195 (1973); see also Comments, 38 *Albany L. Rev.* 407 (1974); 25 *U. Fla. L. Rev.* 794 (1973); 4 *St. Mary's L. J.* 48 (1972); 8 *Houston L. Rev.* 183 (1970); 1967 *U. Ill. L. F.* 805.

In *France v. A.P.A. Transport Corp.,* 56 *N. J.* 500 (1970), this Court, again speaking through Justice Proctor, overruled *Hastings* (33 *N. J.* 247) and accepted the arguments in favor of abrogation of parental immunity. He noted that originally the immunity had been based on the preservation of "family harmony" whereas the recent emphasis had been on the danger of "collusion and fraud." In rejecting these bases he reiterated what he had said in *Immer* (56 *N. J.* 482) and embraced the dissenting views in *Hastings* (33 *N. J.* at 253–261). See also *Heyman v.*

*Gordon, supra,* 40 *N. J.* at 55–60 (dissenting opinion); *Franco v. Davis,* 51 *N. J.* 237, 242–243 (1968) (dissenting opinion). He concluded his opinion with the following:

> After a review of the arguments for and against the parent-child immunity doctrine, we are of the opinion that it should be abrogated in this State. *Reingold v. Reingold, supra, Hastings v. Hastings, supra,* and the cases which follow them are overruled. Our decision today goes no further than allowing suits between unemancipated children and their parents for injuries suffered as a result of the negligent operation of a motor vehicle. See dissenting opinion of Justice Jacobs in *Hastings v. Hastings, supra.* We realize that there may be areas involving the exercise of parental authority and care over a child which should not be justiciable in a court of law. See *Goller v. White, supra, Silesky v. Kelman, supra.* But we are not confronted with such a situation in this case and we will not speculate on what limits, if any, the rule enunciated here should have. 56 *N. J.* at 506–507.

See *Guterman v. Guterman,* 66 *N. J.* 69 (1974).

■ The ultimate holding in *France* (56 *N. J.* 500) was thus limited to suits for injuries resulting from the negligent operation of automobiles. As in *Immer* (56 *N. J.* 482) this was done because strictly that was all that was before the Court and the Court was aware that there may still be some special areas in the parent-child relationship, such as customary care and discipline, which may well be dealt with specially as they were in *Goller v. White, supra,* 20 *Wis. 2d* 402, 122 *N. W. 2d* 192, and *Silesky v. Kelman, supra,* 281 *Minn.* 431, 161 *N. W.* 2d 631. See *McCurdy, supra,* 43 *Harv. L. Rev.* at 1077–1081. But obviously those special areas are not our present concern since they admittedly have no relation to the alleged parental misconduct set forth in the plaintiff's complaint or the causes of action grounded thereon. The reasoning and tenor of Justice Proctor's opinion in *France,* as in *Immer,* leave no room for doubt that he and those who joined him considered the parental immunity to have been terminated in situations, such as the one at hand, where exercise of parental authority and adequacy of child care are admittedly not matters in issue. 56 *N. J.* at 504–507.

The plaintiff's complaint in the case before us is confined to action under the Wrongful Death Act (*N. J. S. A.* 2A :31–1 *et seq.*) ; it does not present any issue bearing directly on the defendant's right to retain property he received because of his wife's intestacy. This Court of course adheres to the highly equitable principle which imposes a constructive trust on property unjustly obtained by a husband through the murder of his wife. See *Neiman v. Hurff,* 11 *N. J.* 55 (1952) ; *In re Estate of Kalfus,* 81 *N. J. Super.* 435 (*Ch. Div.* 1963); *Whitney v. Lott,* 134 *N. J. Eq.* 586 (*Ch.* 1944) ; *cf. Jackson v. Prudential Ins. Co. of America,* 106 *N. J. Super.* 61 (*App. Div.* 1969) ; *Turner v. Prudential Insur. Co. of America,* 60 *N. J. Super.* 175 (*Ch. Div.* 1960). Although in each of the cited cases the murder was committed in New Jersey and there was an ensuing New Jersey criminal conviction, we do not suggest at all that satisfactory proof other than criminal conviction would not suffice. *Cf. Costanza v. Costanza,* 66 *N. J.* 63 (1974) ; *In the Estate of G., Decd., M. v. L. and Others,* [1946] *P.* 183 (*C. A.*) ; 62 *L. Q. Rev.* 218 (1946). In any event the Wrongful Death Act specifically contemplates that action thereunder may be maintained in the absence of criminal proceedings; it provides that when the death is caused by a wrongful act, neglect or default, action for damages may be maintained even though "the death was caused under circumstances amounting in law to a crime." *N. J. S. A.* 2A :31–1.

In *Henderson v. Henderson,* 14 *Fla. Supp.* 181 (*Escambia Cty. Ct. Rec.* 1958), the plaintiff, a four-year-old minor, brought an action through his grandfather as next friend, alleging that his father had "willfully, wantonly and intentionally shot and killed his mother" and seeking damages under Florida's Wrongful Death Act. The defendant moved to dismiss, contending that under Florida law an unemancipated minor could not sue his parent in tort. The court, in denying the motion, made no mention of criminal proceedings but pointed out that the plaintiff's complaint con-

tained "enough factual averments of the defendant's willful misconduct which, if proven, are sufficient to sustain it." In the course of its opinion, rendered well before the recent avalanche of decisions abrogating the parental immunity, it said:

It is generally a wholesome rule to grant the parent immunity from unintentional or negligent personal torts which occur within the scope of domestic relations. The security, peace and tranquility of the home, being the very foundation upon which our society rests, must be protected. But where one parent deliberately and willfully shoots and kills the other parent as alleged in this complaint thereby not only breaking up the family unit but also depriving the child of the support, care, guidance, comfort and companionship of the other parent, he forfeits all claim to immunity. In the words of the nisi prius decision in Henderson v. Henderson, Supreme Court of New York, Kings County, 169 N. Y. S. 2d 106, at page 114 — "A suit upon behalf of the infant cannot properly be deemed the disrupting cause of the family's disunity when the parent by his misdeeds has already caused the tranquility of the family unit to be disturbed and shattered. It would be a distinct disservice not only to the family, but to the state, to place the court's stamp of approval upon the individual who betrayed his trust by maliciously causing injury to his child or ward." 14 *Fla. Supp.* at 185.

In the light of all of the foregoing it is entirely evident that under the pertinent modern legal concepts the present suit by the child through his grandmother, for damages resulting from the wrongful death of his mother, should not have been barred at the threshold. And it is equally evident that the relevant policy considerations dictate the same conclusion. It must be borne in mind that the events described in the complaint occurred far from our State borders and that consequently New Jersey has no concern with or jurisdiction over criminal proceedings.* It has, however, vital

*At oral argument we were told by counsel for Dr. Rockfeld that at the close of its investigation the Florida Grand Jury "returned a letter to the presiding judge suggesting that the matter remain active in the prosecutor's office." Dr. Rockfeld did not testify before the Grand Jury; his counsel stated that: "An invitation was tendered to me as counsel for Doctor Rockfeld by the State's attorney, that if he chose to testify, he certainly would be welcome and I respectfully declined the invitation."

concern with the parties and their civil proceeding and its interests clearly favor disclosure rather than suppression of the truth. In the light of the allegations of the complaint, which for present purposes must be accepted as true, and the acknowledged circumstances, the immunities and any suggested underlying policies can have no pertinency.

There is of course no danger of fraud or collusion and there is no real likelihood of furthering family disharmony. The wife is dead and the family has already been disrupted. The child is now too young to understand and is for all practical purposes in the custody of relatives who may perhaps ultimately adopt him. If the current proceeding results in a determination in the defendant's favor then the air may have been cleared and the way have been paved for a wholesome father-son relationship. If it results in a determination in favor of the plaintiff then the child's interests may be in critical need of additional protection and further proceedings may justly be undertaken.

Any feeling that suppression of the plaintiff's charges may be in the child's interests would seem to be entirely groundless. The charges, which include allegations that the wife was cold-bloodedly murdered by the husband, are now public. There can be little doubt that suppression on procedural motion by the husband will not result in having the matter "lapse into obscurity." When the child reaches understanding age he will undoubtedly know about the charges and will want to know the truth. Although the results flowing from evidence introduced at trial in accordance with our traditional manner of ascertaining the truth may well satisfy him, suppression under claimed immunity surely will not. The harmful effects on the understanding child when first learning that there had been suppression at his father's behest may readily be envisioned.

The suggestion that the trial judge should conduct a full hearing and make a preliminary determination as to the child's interests finds no precedential support anywhere nor does it have any support in reason. Indeed how could

any such preliminary determination be intelligently made without first taking evidence as to whether the father murdered the child's mother as alleged. All in all it is evident to us that the only just and sensible course is to enable the plaintiff to pursue her charges on the merits thereby enabling the defendant to defend on the merits in regular course. To that end the trial judge's summary dismissal of the plaintiff's complaint is hereby:

Reversed.

CLIFFORD, J. (dissenting). Neither precedential compulsion of this Court's prior decisions nor the persuasive effect of any relevant policy considerations leads me to the conclusion that this suit should be allowed. Because I think it should not, I would affirm the summary judgment entered for defendant.

I come to this case with the view that the doctrine of intrafamily immunity still survives in New Jersey, except in automobile negligence cases. *Immer v. Risko,* 56 *N. J.* 482 (1970), and *France v. A. P. A. Trucking Corp.,* 56 *N. J.* 500 (1970), abrogate the immunity only to the extent of permitting, between husband and wife and between parent and child, suits for personal injuries consequent upon negligent operation of a motor vehicle. The opinions in those cases painstakingly so limit themselves, with their precedential value likewise being circumscribed.

While I readily concede that I might very well be willing to extend the abrogation of the immunity further in a variety of situations, I am reminded by Justice Hall's opinion for the Court in *Hastings v. Hastings,* 33 *N. J.* 247, 250 (1960), that

[m]atters of immunity must be determined, in the absence of specific legislation, on the basis of policy or, perhaps more accurately, on the weighing of competing policies. * * * In situations other than the precise one before us, consideration of the policies in the light of specific facts may lead to different results, but it will be time enough to announce a conclusion on them when the occasion is specifically presented to us.

And so I confine myself to the specific facts of this case in which, as in *Heyman v. Gordon*, 40 *N. J.* 52 (1963), the real and only party in interest is the son. A cause of action is asserted on his behalf under the wrongful death act, *N. J. S. A.* 2A:31–1, *et seq.*, seeking from his father money damages for allegedly causing the death of the boy's mother either by murder or by grossly negligent and wantonly reckless conduct. While the claim doubtless would survive, by virtue of the impact of *France* on *Heyman*, were it grounded in negligent operation of an automobile, entirely different policy considerations[1] are implicated when the case is based on an intentional wrong. Here the focus is generally acknowledged to be on family harmony and domestic tranquility. *See* McCurdy, "Torts Between Persons in Domestic Relation," 43 *Harv. L. Rev.* 1030, 1074–76 (1930); Comment, "Intrafamily Immunity — The Doctrine and Its Present Status," 20 *Baylor L. Rev.* 27, 57 (1967); Chopin, "Parent-Child Tort Immunity: A Rule in Need of Change," 27 *U. Miami L. Rev.* 191, 194–95 (1972).

Thus, I see the essential policy questions as first, whether allowance of the suit will tend to threaten the relationship between this father and this son — a relationship which at this point, as so well put by Judge Conford, is presumptively a normal and loving association and one of "incal-

---

[1] The prevalence of automobile liability insurance is plainly at the root of the abrogation of intrafamily immunity in automobile cases. See *Immer v. Risko, supra*, 56 *N. J.* at 489. With no intention of attempting resurrection of an equine beast of burden long since flailed to death, I am nevertheless constrained to express wonderment at the curiously circular reasoning which uses insurance as the justification for the imposition of liability. I take it the analysis runs something like this: liability insurance is a contract to indemnify one for the money damages flowing from one's legal liability; in the typical situation (wife sues husband or unemancipated child sues parent on account of personal injuries resulting from negligent vehicular operation) the courts will permit the imposition of legal liability because of the presence of insurance. Or put somewhat more simplistically: if there is legal liability, there is insurance; if there is insurance, there is legal liability. See also the dissenting opinion of Francis, J., in *Immer v. Risko, supra*, 56 *N. J.* at 496–499.

culable benefit to the child;" and second, whether in the circumstanecs this Court should vindicate the right of the infant to sue.

· Because I believe the question of the child's best interests and the issue of domestic tranquillity in the form of the father-son relationship are, in this case, so inextricably intertwined as to be substantially identical, I would adopt the perceptive analysis of Judge Conford but would not, as he would, defer resolution of the first question. The record before us is sufficiently enlightening as to lead me to the firm conclusion that a relationship worth preserving would be subjected to a serious risk of damage were this litigation to go forward. I so conclude precisely for the reasons set forth at greater length in Judge Conford's dissent. What little I would add follows.

The suspicion is strong that the boy, Scott Rockfeld, is somehow being used as the innocent pawn in an acrimonious dispute between plaintiff, Clara Small, and defendant. That the intention is to punish defendant is made abundantly clear, if not by what surfaced in defendant's separate action for declaration of his wife's death[2] and in the proceedings to establish the grandparents' visitation privileges, then certainly by the claim in the complaint for punitive damages.[3] I recognize that I cannot indulge the stated suspicion as a ground for decision herein and hasten to assure that my conclusion would be the same were some more neutral party acting as administrator ad prosequendum. The grandmother would, in any event, remain the driving force behind this

---

[2]In that action Dr. Rockfeld testified fully and completely under oath, without resort to any privilege against self-incrimination, for hundreds of pages of transcript and was vigorously and indelicately cross-examined as to the circumstances of the occurrence giving rise to this suit.

[3]Punitive damages are clearly not allowable under this wrongful death action, *Kern v. Kogan*, 93 *N. J. Super.* 459 (Law Div. 1967), even under the majority's view of the case.

litigation. Obviously, at his tender age the child is incapable of making a decision as to whether he wants to sue his father. If that decision were within his capabilities, and assuming the reliability thereof, I might not view that circumstance as entirely determinative, but it would be persuasive in allowing a suit under otherwise similar facts because of the clear absence of any harmony susceptible of being preserved.

In my approach to our problem the answer to the second essential policy question — whether in the circumstances this Court should uphold the right of the infant to sue — follows automatically from my perception of the litigation as posing an unwarranted risk of disruption of the father-son relationship. I view the hoped-for reconstruction of the family, here threatened by the very judicial process whose every effort should be in the direction of preservation of that relationship, as being of a superior social value to the vindication of any remedy of the son vis-à-vis his father. (It is no answer to point to the father's intentionally wrongful conduct as having destroyed the family unit; the Florida criminal process may be relied on to vindicate society's interest in seeing to it that Dr. Rockfeld does not "get away with murder.") The need to expose the "truth" is insufficient justification for promoting the quest for dollars at the expense of the interests of familial harmony. At least that is so in this case where, as we are informed by counsel, plaintiff's attorney has substantially all of the information available to the Florida prosecuting authorities. Should the infant want at some future time to satisfy his curiosity as to what the evidence shows with respect to his mother's death, that should be available from the attorneys in an atmosphere free of the acrimony which any trial would engender. As noted, his father's version is already memorialized in a lengthy transcript.

Extracting and identifying the various considerations which contribute to a determination of just policy in this delicate area is a most difficult undertaking. Evaluating them after they have been thus isolated is equally hazardous.

The complexity of the problem is increased by the triangular nature of the relationships in this case — not the "straight-line" relationships of husband-wife or parent-child, but a three-way interplay involving the impact on the son of what the father did to the mother.

That complexity is heightened even further by the knowledge that the purported beneficiary of this action cannot speak or reason for himself. The case at bar is one of a special category wherein there is a potential for the intrusion of interests other than those of the beneficiary. That element bespeaks the necessity of intensifying a court's concern for familial harmony. Particularly is this so where the jaundiced perspective of an interloper or one on the periphery of the father-mother-son relationship might adversely affect what remains of the family unit. This special class of cases not only rasies doubts as to the future of the majority's blanket abrogation of intrafamily immunity, but it also strengthens my inclination to adopt an *ad hoc,* case-by-case approach to this area of family law. One may thus question whether, by moving from the pre-*Immer* and *France* position of intrafamily immunity in all instances to the opposite extreme of almost total abrogation of the doctrine, the majority has missed the mark. It has at least turned its back on the salutary notion that when an established doctrine is attacked as outmoded, any erosion at the hands of a court is customarily gradual. *Hastings v. Hastings, supra,* 33 *N. J.* at 261 (dissenting opinion of Jacobs, J.). We are in a maze-like and enormously sensitive field of the law, made the more so by fact patterns heretofore perceived only dimly and by policy considerations explored not in depth. That circumstance mandates, at a minimum, a more cautious step-by-step process of change than the sweeping and abrupt one pursued by the Court.

Because this dimension of complexity simply adds to the inherent formidability of the task of articulating any general rule, I would go no further than deciding that, for the reasons expressed in Judge Conford's dissent as supplemented

herein, the threat to the father-son relationship in this case dictates disallowance of the action.

Finally, while my discussion and conclusions may not bear a stamp of inspired certainty, I suppose in the final analysis I have only my own instincts and experience, my notions of human relations and their nuances, on which to rely, and admittedly they may not be very reliable. The judicial function here calls for a certain predictive skill. I am acutely conscious of the fact that "[a] judicial approach does not make the future more readily foreseeable and the assurance of our decision, whatever it be, is unfortunately circumscribed by the frailties of human judgment." *Lavigne v. Family & Children's Soc'y of Elizabeth,* 11 *N. J.* 473, 483 (1953) (Wachenfeld, J., dissenting).

I would affirm.

CONFORD, P. J. A. D., Temporarily Assigned (dissenting). My view is that resolution of the highly portentous question argued regarding extension of the right of action in tort by infant children against parents beyond the limitations set by this court only five years ago in *France v. A.P.A. Transport Corp.,* 56 *N. J.* 500 (1970), should await a considered determination in this case as to whether the welfare and best interests of the child, Scott, call for the prosecution of the action. A fuller record than that here before us is necessary for an adequately informed decision on that delicate question, and my vote at this point in the case is for a remand with directions for a hearing and finding by a trial judge on the stated question, this court retaining jurisdiction in the interim. If it were ultimately determined that the child's best interests and welfare would not be served by prosecution of this action, the substantive legal question decided by the majority could be resolved at a future date, hopefully on a more satisfactory record, less complicated by conflicting *ad hoc* familial considerations than the present one.

There can be no question as to the right and duty of the court, in the exercise of its ancient Chancery *parens patriae*

jurisdiction in an appropriate case, to look into and supervise the taking of any action affecting the welfare of an infant child, its person, property or custody. 42 *Am. Jur.* 2d *Infants,* § 22, p. 27; *Fanlony v. Fanlony,* 21 *N. J.* 525, 535 (1956); *Henderson v. Henderson,* 10 *N. J.* 390, 395 (1952); *Moreland v. Hollo,* 15 *N. J. Super.* 135, 138 (App. Div. 1951). I have no doubt that a court should exercise such jurisdiction, in a proper case, on its own motion, since the parties to the litigation may not discern the welfare problem that catches the eye of the court. Moreover, it is well said that "* * * the court's action [*parens patriae*] is not limited by any narrow bounds but [it] is empowered to stretch forth its arm in whatever direction its aid and protection may be needed". 42 *Am. Jur.* 2d, *ubi cit. supra.*

In the present case the court should be particularly alert to the matter of the child's interests as the administratrix ad prosequendum may well be in a position of conflict of interest with the child in that regard. Understandably, the administratrix is interested in punitive action against the defendant, who she believes is responsible for her daughter's death. She was not emotionally in a position, in deciding to institute this action, essentially one on behalf of the child, see *Heyman v. Gordon,* 40 *N. J.* 52, 54 (1963), fairly to judge and to give consideration to whether the child's best interests would be served by such an action.

The prospective harm to the child in a personal and psychological sense in the bringing of this action lies in the threat of a favorable judgment therein to the future fatherson relationship of the defendant and the child. See *infra.* On the basis of what is now known, however, the viability of that relationship is in some question, and requires clarification. The pending Chancery Division action mentioned in the majority opinion was instituted by Dr. Rockfeld, present defendant, to secure a statutory adjudication of the death of his wife. In its course, the maternal grandparents of the child sought an order, opposed by Dr. Rockfeld, permitting them to have periodic overnight visitations with the child

at their own home. This request was granted by the court after a hearing in May 1973, in which, as related by the majority, Dr. Rockfeld testified on direct examination that he had discussed with his sister and brother-in-law, who were then caring for the child, the possibility of their eventual adoption of it. It may be suspected that this testimony might have been geared to minimize the prospect of a future close relationship between the maternal grandparents and the child. In any event, on an application by Dr. Rockfeld some months later for modification of the order to eliminate the overnight visitations, which was granted, he testified that he intended to retain his parenthood over the boy, in a reconstructed family, explaining that his earlier consideration of adoption by his sister was the product of a distraught condition following the death of his wife.

It would be inappropriate and unfair to all concerned for us to come to a present determination as to the probabilities of a good parenthood relation between defendant and the child, for *parens patriae* purposes, on the testimony aforementioned, as it was taken in a different proceeding involving different issues. Moreover, the parties have not yet been heard on this issue. It was raised not by the defendant but by the writer of this opinion. *Roxbury State Bank. v. Clarendon,* 129 *N. J. Super.* 358, 375 (App. Div. 1974), certif. den. 66 *N. J.* 316 (1974). A remand for the express purpose of determining where lie the best interests of the child would be likely to produce all the available evidence relevant to that question — most significantly the matter of the future status of the child *vis a vis* the defendant.

But as the matter now stands, unless a different picture is developed on a remand, the presumption must be that the future relationship of the defendant and the child will continue to be that of father and son, probably ultimately in a different household from that which they now share with the Dorfs. The assumption must also be that the normal filial respect and affection which attend the relationship between a father and a young son will exist here, although

subject to the hazards that others may attempt to impair that relationship. The need of a young boy for his father is undoubtedly accentuated by the loss of a mother, and the future destruction or substantial impairment of that tie may well be the gravest threat that this child faces in the years ahead.

I strongly dissent from the intimation in the court's opinion that the child's interests will necessarily be served by a verdict in the present action in that when he reaches understanding age he will "want to know the truth". In the first place, the jury verdict will of course not constitute a revelation of "the truth" of the matter, whether or not it is in favor of plaintiff, but merely a collective guess from circumstances apparently not likely to be expanded beyond those objective facts which are now known, which create substantial suspicion but seemingly will still leave a permanent question mark. We were told at oral argument that despite a full investigation by the Florida authorities no action has been taken by the local grand jury.

But apart from the fact that the adjudication will not apprise the child of the "truth" I am clear that the prospective normal, loving association between father and son which may be substantiated on a fuller record (and until then is a natural inference) — a relationship of incalculable benefit to the child — would best be safeguarded by permitting this episode to lapse into obscurity. (I of course am not alluding to any appropriate action by the law enforcement authorities.) To confront the child when he reaches understanding age (or possibly even before) with the fact that a court adjudicated his father culpably responsible for the death of his mother — in witness whereof there is a trust fund of money damages exacted by the court from the father to repair the child's loss of his mother — would in my view be calculated to visit immediate and continuing psychological harm on the child and to threaten the vitiation of the father-son nexus then existing, with consequent further irreparable injury.

I am further in disagreement with the suggestion in the court's opinion that a jury verdict in favor of the plaintiff could justify "further proceedings" for "additional protection" of the child, if what is meant is termination of the father's custody. On the objective facts now known or in reasonable prospect of discovery, I am not in accord. On those facts this child's present and future need for his father should clearly outweigh a civil jury's adverse appraisal of his conduct in relation to the tragic episode.

While ordinarily a prospective money judgment in favor of an infant plaintiff is of course to his advantage, this is not the ordinary case. The potential for psychological and familial damage has been discussed. As a counter to the pecuniary benefits of such a judgment, the child can presumably, without it, look forward to financial support, sustenance and beneficence from a father to whom he will always represent the natural object of the father's bounty. The need for defendant to satisfy such a judgment out of personal assets (there apparently is no insurance) may constitute yet another irritant in the family relationship. In view of the child's half-million dollar inheritance from his mother alone, his future financial welfare seems assured without the necessity of securing for him a recovery in this case.

The matter of the best interests of the child should be fully explored on a remand, to be followed by such later proceedings as are mentioned above.

*For reversal*—Justices JACOBS, HALL, SULLIVAN and PASHMAN—4.

*For affirmance*—Justice CLIFFORD—1.

*For remandment*—Judge CONFORD—1.